[No. A044800. First Dist., Div. Three. Aug. 3, 1990.]

GREATER MIDDLETON ASSOCIATION et al., Plaintiffs and Respondents, v.
HOLMES LUMBER COMPANY et al., Defendants and Appellants.

**COUNSEL**

Adams, Levin, Bosso, Sachs & Bates, Bosso, Williams, Levin, Sachs & Book and Alan J. Levin for Defendants and Appellants.

Bryan & Beckwith, Brian Beckwith and Laura A. Bryan for Plaintiffs and Respondents.

## OPINION

**MERRILL, J.**—Plaintiffs are property owners within the same tract of land as defendants and have filed the instant action for injunctive and declaratory relief[1] seeking to enjoin defendants from commercially harvesting timber on their land, by way of a restrictive covenant in the deeds of the parties and/or their predecessors in interest, limiting use of the land "exclusively" for residential purposes. The trial court granted this relief, finding that the restrictive covenant "permanently" restricted use of defendants' property in such a way "so that no commercial logging activities are permitted." The court held that the covenant was enforceable as a mutual equitable servitude imposed upon defendants' land pursuant to a general plan, which plan "similarly" restricted all parcels within the tract. Defendants appeal from this judgment. We affirm.

### I

Plaintiffs Laura A. Bryan, Timothy G. Geiser, Malcolm McGilvray, Jr., and McGilvray Properties, Inc.,[2] and defendants James H. Holmes, Lester T. Holmes, Mary Lynn Holmes, Mildred M. Holmes and Lawrence W. Holmes,[3] are individual property owners in a vast tract of land which was once under the common ownership of one man, William H. Middleton. The tract (Middleton Tract) consists of approximately 560 acres of land which is located in the Santa Cruz Mountains in San Mateo County. Over the years the tract has been subdivided into some 80 parcels of property of various shapes and sizes. Plaintiffs are owners of 13 of these parcels. Defendants, who are related to each other by either blood or marriage, are owners of three other parcels. Defendants' parcels are among the largest in the tract, totaling approximately 144 acres of land, and like much of the remainder of the tract, are thickly forested with redwood and Douglas fir trees. The

---

[1] Plaintiffs' complaint also contains causes of action for trespass and nuisance. The trial court indicates in its statement of decision that this part of the action was severed upon stipulation of the parties, and provides in its judgment that these causes of action were severed as a separate action.

[2] Another named plaintiff in the action is the Greater Middleton Association, an incorporated association of property owners in the Middleton Tract, founded in 1986. The association itself has no property holdings.

[3] Two other named defendants in the action are: Roy Webster, a licensed professional forester, who was hired by defendants to supervise logging on their property; and the Holmes Lumber Company, which is apparently owned, in whole or part, by some of the defendants.

instant case involves construction of certain language contained in the original deeds of conveyance transferring title to property in the tract. Some background information is necessary for purposes of our analysis.

Middleton Tract was purchased by Middleton sometime prior to 1923. Middleton received title to the great expanse of land by way of several deeds. The tract is legally described as: the northeast quarter of section 5; the east half of the southeast quarter of section 5; the west half of section 4; all in township 8 south, range 3 west, M.D.B. & M. Between 1923 and 1924, Middleton conveyed the first five parcels of property in the tract. The deeds for these conveyances required specific improvements of the conveyed property, reserved various rights of way, and contained several conditions, including conditions forbidding the sale of liquor and forbidding various commercial uses of the conveyed property. These deeds contain no restrictive covenants nor mention of a general plan for the benefit of the tract or of covenants running with the land. None of these deeds are within either plaintiffs' or defendants' chain of title.

In 1926, Middleton executed a deed conveying a parcel of land to one W. B. Owens. This deed was the first by the grantor to contain restrictive covenants requiring residential use exclusively of that parcel and all other parcels within Middleton Tract. Specifically, the deed states: "SUBJECT, HOWEVER, to the following restrictive covenants, the burden of which and each and every one of which, is intended to bind, and the benefit thereof intended to inure to, the grantee and the grantors and their respective heirs and assigns, and, in each case, to run with the land in order to further and carry into effect a general plan of development which has been adopted by the grantors for the tract of land hereinabove mentioned and described of which the property herein conveyed is a part, said plan being designed to preserve the natural beauties of the entire tract and to make the said tract attractive for residence purposes by reason of such covenants which are imposed upon each and all the lots in said tract and the owners thereof and the title thereto and to which each and all the said lots and the owners thereof and the title thereto are made subject.

"·   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"2.   The property herein conveyed and each and every lot in said tract, shall be used for residence purposes exclusively; no building or structure pertaining to or for the conduct of business of any kind whatsoever shall ever be erected thereon. Without in any way limiting the interpretation, operation or effect of the covenants herein set forth, it is particularly covenanted that no hotel, apartment house, rooming house, restaurant, lunch counter, hospital or sanitarium, hog or chicken ranch, dairy, camp or picnic

ground, public parking ground, or public resort of any kind, shall be erected, conducted or maintained on the property herein conveyed, or any part thereof, nor upon any lot or parcel of land in the said tract.

"·   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"6.   Each and every reservation and covenant above set out is intended for and is for the benefit of each and every lot in said tract, and of the owners thereof, and a breach of any one of said covenants may be enjoined or prevented by any person owning any property in said tract."

It will be noted that the quoted passage states that the general plan is for the benefit of "the tract of land hereinabove mentioned." This refers to a legal description of Middleton Tract which precedes this passage in the deed and serves to identify the dominant tenement in relation to the restrictive covenants. The passage in its entirety is contained verbatim in the next 16 deeds of conveyance transferring title to other parcels of property in the tract, executed between 1926 and 1936.[4]

Between 1938 and 1958, 11 more parcels were conveyed. Relative to these, the deeds continue to recite the same restrictive covenants verbatim, including the one restricting land use exclusively for residential purposes. Additionally, they make reference to the same general plan. However, the description of the dominant tenement varies, often describing areas smaller than the tract itself. In two of the eleven deeds, no reference is made at all to a dominant tenement.

Thereafter, between 1958 and Middleton's death in 1962, 32 additional parcels were conveyed. All but four of the deeds in these transactions contain the same restrictive covenants. Twenty-four describe the dominant tenement as a certain portion of section 5, while seven contain no description of a dominant tenement at all. Nine do not mention a general or common plan.

In his will, Middleton devised several more parcels of property to family, friends or relatives. He devised one parcel located along Portola State Park Road "in Trust, for the use of the owners of the property in the Middleton Tract; such use to be a community use." He devised his remaining holdings in the tract, totaling some 228 acres, to relatives, Mr. and Mrs. Harold Black. He specified that the Blacks were to have one parcel for themselves, consisting of between five and twenty acres. Regarding the remainder of the

---

[4] Neither a subdivision map nor a tract map was apparently ever filed with the county or the state by Middleton.

property, he instructed his executor, Joseph Smith, to sell it for the Blacks' benefit in parcels of not smaller than five acres and not larger than twenty acres. Middleton indicated that all subsequent transfers were to be subject to the same restrictive covenants, quoting verbatim the passage provided above. The will further introduced for the first time two additional restrictions: "5. There must be no commercial logging. Trees may be cut for the use of the owners of the parcel. [¶] 6. There must be no hunting of wild game or fowl."

Following Middleton's death, his estate conveyed 10 additional parcels of property between 1963 and 1967. All of the deeds pertaining to these conveyances contain the original restrictive covenants, including the one restricting land use exclusively for residential purposes. The dominant tenement continues to be described as a portion of section 5. The first eight deeds fail to mention the additional restrictions set forth in Middleton's will relative to commercial logging or hunting. However, the last two deeds do contain these restrictions. The grantee of one of these deeds was defendants' predecessor-in-interest, Waldo H. Leynse.

Leynse purchased the property in 1967. Faced with approximately 190 acres of tract property still to be conveyed, the estate decided to deed all of this property to him as one big parcel, "parcel 70." In doing so, the estate specified that Leynse was to carry out the basic will and testament of Middleton in that he would sell said property in parcels of not less than 5 nor more than 20 acres, or in the event that he did sell larger parcels than 20 acres, he warrant with the subsequent purchaser(s) that the subsequent purchaser(s) carry out the provisions of Middleton's will in this regard. As already noted, the deed to Leynse contained the original restrictive covenants restricting land use exclusively for residential purposes as well as the additional restrictive covenants specifically banning commercial logging and hunting.

The record at trial includes a letter written by the executor of the Middleton estate, Joseph Smith, in response to some inquiries by Leynse regarding the restrictions on the size of subsequent parcels and commercial logging. Leynse apparently wanted to build a road on the property and needed to clear some of the land in order to do so. He wanted confirmation from Smith that he would not be violating the covenant against logging in doing so. The letter is dated June 15, 1967, which is two months following Leynse's purchase and states: "(4) In regard to commercial logging I would say your interpretation is correct. However, care should be exercised to be sure that absolutely the minimum amount of trees are removed. For instance, if trees are cleared for the roadway and at a later date it is decided another roadway was to be used and more trees are cleared, I would say,

that this would be a violation of the restrictions. The same would apply to a building site. The restriction is a valid one which I believe everyone understands and should be guided accordingly. I believe both you and I agree that one of the main values of the property are the trees *standing on the property* and not logs sold for timber leaving stumps on the property and thereby greatly depreciating the value of the property."

On July 23, 1974, Leynse conveyed approximately 95 acres in 2 deeds to defendants (referred to as parcels 70 (b) and 70 (d) in the parties' exhibits) for $76,000. In 1984, Leynse conveyed another approximately 49 acres to defendant Lawrence Holmes (referred to as parcel 70 (c)) for $150,000.[5] Included in the record is a signed acknowledgement by all of the defendants acknowledging the restrictions in Middleton's will regarding the size of subsequent parcels. Additionally, the acknowledgement states: "As purchaser of the aforementioned property I have read, understood, and recei[ved] . . . a copy of a letter dated June 15, 1967, and written by Joseph B. K. Smith, attorney at law, stating further the conditions in which the property may be purchased or sold."

Currently, there are some 80 parcels of property within Middleton Tract. Approximately 42 single family dwellings have been erected. Some of these single family dwellings are permanent residences while some are recreational in nature. There are no commercial establishments of any kind. At the time plaintiffs or their predecessors-in-interest first purchased their property, either Middleton or his estate still held title to the property now owned by defendants. The original deeds of conveyance to their property all contain the original restrictive covenants. It is plaintiffs' position that they purchased their property in reliance on these covenants, in particular the one prohibiting nonresidential use of property within the tract.

In 1986, Holmes Lumber Company obtained approval of a Timber Harvesting Plan from the California State Board of Forestry allowing commercial logging activities on defendants' property. The approved Timber Harvesting Plan allows timber to be harvested from the property for a period of up to three years. Defendants have conducted preharvest activities on their property including a geological analysis, surveying and marking locations for skid trails, new roads, widened roads, and loading areas.

Plaintiffs filed the instant action on August 7, 1986, charging defendants with violating the restrictive covenants limiting use of their property for residential purposes and prohibiting commercial logging thereon. Defendants answered the complaint claiming that the covenants are unenforceable

---

[5] The deeds from these transactions are not a part of the instant record.

as unreasonable restraints and burdens on the land. The case proceeded to trial.

The trial court issued its tentative decision on October 24, 1988, and subsequently adopted it as its statement of decision. The court rejected plaintiffs' theory that the restrictive covenants in Middleton's deeds are covenants running with the land, based on Civil Code section 1462. Nevertheless, it found in favor of plaintiffs based on the theory of mutual equitable servitudes. The court found that 75 percent of the deeds executed by Middleton or his estate between 1923 and 1972 refer to a general plan " 'for the purpose of preserving the natural beauties of the entire tract and to make said tract attractive for residence purposes.' " It found that these deeds also contain restrictions " 'in order to further and carry into effect' " that common plan. Interpreting this language, the court said it evidenced an intent on the part of the grantor "and each grantee that the land conveyed is to be restricted pursuant to a general plan, that the restrictions are for the benefit of all other parcels in the subdivision, and that all other parcels shall be subject to such restrictions for its benefit [citations]." The court said, "[T]he fact that 75% of the deeds . . . contain the same restriction to residential use establishes a uniformity sufficient to indicate unmistakably a designated and adopted plan throughout." The court found that defendants had both constructive and actual notice of these restrictions.

Dealing with the inconsistencies in language describing the dominant tenement, the court noted that "[e]xcept for those deeds which contain no reference at all to the common plan, all of the deeds contain some designation or description of a dominant tenement." The court referred to what it termed an "internal ambiguity" in those deeds describing the dominant tenement as an area less than the actual size of the Middleton Tract. It noted, "[T]hose deeds state that the parcels being conveyed are a part of 'said tract,' but, as defendant's Exhibit D shows, nearly all of the parcels are *not* in the tract as described. The deeds then go on to state the general plan for the benefit of the tract 'hereinabove mentioned and described of which the property herein conveyed is a part' (though in fact it is not) and then lists the restrictions, including the restriction to residential use."

The court proceeded to resolve these ambiguities by employing the same rules of construction as used in interpreting contracts. It said, " 'In interpreting incomplete or ambiguous deeds, courts may consider extrinsic evidence of the circumstances under which the deed was made.' [Citation.] The circumstances here include: the previous 17 conveyances using the same language of general plan and restrictions but describing the tract as the much larger area in which *all* the parcels are located; the reference in Middleton's will to parcel 71 as within the tract, though the subsequent

deed includes the smaller tract description, which does not include parcel 71; the reference in the will to his remaining property as within the tract. It must be concluded that the small description of the tract is an error and does not reflect the intent of the grantor and grantee."

Finally, the court held that the covenant restricting land use "for residential purposes only" clearly and unambiguously excludes any commercial use including logging. The court rejected defendants' contention that plaintiffs' land will not benefit from a ban on logging. It said, "[T]he evidence showed that the logging will have visual and noise impact on plaintiffs' property. The purpose of the restriction clearly was to preserve the natural condition of the tract around a limited number of residences, for the enjoyment of the landowners' physical senses. One of the most obvious 'natural beauties' of the tract is the extensive forest. Commercial logging would remove some of the natural beauty that makes the tract desirable for other property owners. Thus, enforcement of the restriction will benefit plaintiffs."

The court said that although enforcement of the restriction will prevent defendants from realizing their planned profit, this "is not oppressive or harassing, particularly in light of the fact that defendants had notice of the restrictions." Additionally, the court noted, "[N]o evidence was introduced that showed that the defendants in purchasing the land, paid more for said parcel because of its 'potential for harvesting lumber' than the property would have sold if it was limited to residential purposes only." It concluded, "The balance of equities weighs in favor of plaintiffs."

## II

Preliminarily, we note the scope of our review, since there appears to be some disagreement between the parties over this issue as well. ■ "The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the [instrument] based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' [Cita-

tions.]" (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839], fn. omitted.)

Since there is essentially no conflict in the evidence in the case at bar, we will make an independent determination in interpreting the subject deeds.

### III

■ Defendants initially challenge the trial court's finding that the restrictive covenant at issue here—i.e., the one restricting use of the land for "residential purposes only"—is enforceable as an equitable servitude. As might be expected, they point to the inconsistency in the deeds relative to the covenants and the description of the dominant tenement. They further argue with the finding that the restriction, as it pertains to commercial logging, is beneficial to the other landowners in the Middleton Tract. Defendants admit that the deeds evidence an intent on the part of Middleton to limit the use of property within the tract for residential purposes. Nevertheless, they contend that that fact alone does not constitute "sufficient compliance with the prerequisites for creating mutually enforceable equitable servitudes for a tract of land."

In the landmark case of *Werner* v. *Graham* (1919) 181 Cal. 174 [183 P. 945] the California Supreme Court gave approval to the concept of mutual equitable servitudes as a method of imposing reasonable land use controls and private restrictions on the property of a grantee provided that certain requirements are met. ■ "According to *Werner*, a general plan of real estate development can give rise to mutual equitable servitudes only when both the grantor and grantee intend that the land conveyed is to be restricted pursuant to a general plan, that intent appears in the deed, the parties' agreement shows that the parcel conveyed is subject to restrictions in accordance with the plan for the benefit of all the other parcels in the subdivision and such other parcels are subject to like restriction for its benefit, and the dominant and servient tenements are adequately shown. [Citations.] 'In such a case the mutual servitudes spring into existence as between the first parcel conveyed and the balance of the parcels *at the time of the first conveyance*. As each conveyance follows, the burden and the benefit of the mutual restrictions imposed by preceding conveyances as between the particular parcel conveyed and those previously conveyed pass as an incident of the ownership of the parcel, and similar restrictions are created by the conveyance as between the lot conveyed and the lots still retained by the original owner.' [Citations.]" (*Terry* v. *James* (1977) 72 Cal.App.3d 438, 442-443 [140 Cal.Rptr. 201].)

■ It is important to note that "[f]rom the recordation of the first deed which effectively imposes restrictions on the land conveyed and that

retained by the common grantor, the restrictions are binding upon all subsequent grantees of parcels so affected who take with notice thereof notwithstanding that similar clauses have been omitted from their deeds. [Citations.]" (*Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 507 [131 Cal.Rptr. 381, 551 P.2d 1213].)

■■■ Keeping these guidelines in mind, we proceed to analyze the 77 original deeds of conveyance within the Middleton Tract to determine whether or not they give rise to a mutual equitable servitude restricting the use of the land within that tract for residential purposes. ■■■ For such a servitude to exist, the three requirements under *Werner* are: (1) that the deeds evidence an intention on the part of both the grantor and the grantee that the land conveyed is to be restricted pursuant to a *general plan*; (2) that the deeds show that the parcel conveyed is subject to the restriction at issue in accordance with the plan for the benefit of all the other parcels in the subdivision and such other parcels are subject to like restriction for its benefit; and (3) that the dominant and servient tenements be adequately shown.

■■■ Considering the first two requirements together, we find virtually all of the deeds to be in compliance. Most contain the language quoted earlier in this opinion, said language making each conveyance subject to a number of restrictive covenants including the one restricting use of the land for "residence purposes exclusively," stating that the burden and the benefit of these covenants are intended to "bind" and "inure to" the grantee and grantor and their respective heirs and assigns "in order to further and carry into effect a general plan of development which has been adopted by the grantors for the tract of land hereinabove mentioned and described . . . , said plan being designed to preserve the natural beauties of the entire tract and to make the said tract attractive for residence purposes by reason of such covenants which are imposed upon each and all the lots in said tract . . . ."

Of the 77 deeds, only 14 do not make reference to the general plan and only 13 do not contain the restrictive covenant limiting the use of the land for residential purposes. Of these, five represent the first five transfers that Middleton made which predate any expression of a general plan. While void of any reference to the general plan and/or the subject restrictive covenant, these deeds nevertheless do contain the following covenant: "That no Hotel, Boarding or Lodging House, or Public Camping Ground, hog or chicken ranch, dairies, hospital or sanitarium shall be erected, run or maintained, or be permitted to be erected, run, or maintained, upon the said property or any part thereof by said parties of the second part, their heirs, representatives and assigns."

Four of the deeds that do not mention the general plan and six of the deeds that do not contain the subject restrictive covenant represent conveyances which are not in any way inconsistent with the plan or the covenant and which are, in fact, compatible. Three of these conveyances are to water companies serving all of the property owners within the tract. One is to the National League for Women's Service. One permits residential or "semicommercial" use. Here, the semicommercial use is strictly limited to "public camping to include cottages, public picnicing and a public restaurant or other food facility." As noted by plaintiffs, the conveyance to the National League for Women's Service and the conveyance for residential or semicommercial use, pertain to parcels located in one corner of the tract, fairly removed from other parcels. One other deed in this group is to land which was to be held in trust for the use of all property owners within the tract, "such use to be a community use."

Finally, one of the deeds without reference to the plan or the covenant represents the conveyance of three parcels of land in one corner of the tract and another represents the conveyance of a very small parcel in settlement of a claim against the Middleton estate. The three remaining deeds, bereft of a specific reference to the plan, nevertheless contain the restrictive covenant limiting the use of the land for residential purposes and indicate that the covenant is for the benefit of each and every lot in the tract.

■  As a rule, in order to create an equitable servitude, the general scheme of restrictions must be " 'sufficiently uniform in character to indicate unmistakably a designated and adopted plan throughout common to all purchasers of lots . . . .' [However,] some variety is to be expected inasmuch as it is common to plan for the development of some parcels in a manner different from but complementary to the majority of the parcels; often this depends on the geographical location of the parcels in the development tract." (*Terry* v. *James, supra*, 72 Cal.App.3d 438, 444.) ■  Considering the facts in this case and the pertinent law, we think it manifest that the first two requirements under *Werner* for the creation of an equitable servitude, limiting the use of the land in Middleton Tract exclusively for residential purposes, have been met. The deeds at issue contain a general scheme of restrictions in this regard which is sufficiently uniform to indicate unmistakably a designated and adopted plan throughout common to all property owners within the tract.

## IV

This brings us to the third and final requirement under *Werner* for creating an equitable servitude and that is, that the dominant and servient tenements be "adequately shown." (*Terry* v. *James, supra*, 72 Cal.App.3d at

p. 442.) It is apparent from the record that there is considerable variation in the deeds regarding the description of the dominant tenement. Beginning with the first deed referencing the general plan and the restrictive covenant at issue, and continuing with the next 16 deeds of conveyance, the dominant tenement is described in terms of the area comprising the entire Middleton Tract. Following this, the description changes a number of times. All of the subsequent descriptions are of areas that are smaller than Middleton Tract. Approximately five deeds do not contain any description of a dominant tenement.

In view of these discrepancies, the trial court properly admitted extrinsic evidence of the circumstances surrounding the deeds. This evidence includes a county map, dated 1973, officially designating the area plaintiffs refer to as "Middleton Tract." Also included is Middleton's will wherein Middleton devised the parcel of tract land containing his own cabin. Therein, Middleton specifically states that his parcel is situated in "the WILLIAM H. MIDDLETON TRACT," even though he continues to describe the dominant tenement as an area smaller than the tract, an area of which his parcel is not a part. Still other evidence consists of maps of the private road system within Middleton Tract. Analysis of these maps in connection with the right-of-way easements contained in the vast majority of deeds, establishes that many of the parcels in the tract can only be accessed if the dominant tenement consists of the entire tract. Finally, there is the testimony of two property owners within the tract who said that it had always been their understanding that their property was a part of Middleton Tract even though the deeds to their property described a smaller area as the dominant tenement. Following its consideration of this evidence, the trial court determined that those deeds containing descriptions of the dominant tenement as something less than the entire area making up Middleton Tract are in error in this regard and are not reflective of the intent of the respective grantor and grantee. Having reviewed the same evidence, we are in agreement with the trial court's finding in this respect.

Considering the uniformity and consistency in the vast majority of the deeds relative to the statement of the general plan and the restrictive covenants restricting the use of the land conveyed therein; considering the fact that the first 17 deeds which contain statements of the general plan in conjunction with the restrictive covenants, uniformly describe the dominant tenement in terms of the entire Middleton Tract; considering the significant variation in the description of the dominant tenement in the deeds thereafter and such obvious and blatant errors in these descriptions as the designation of township 8 as township 3; considering the number of deeds wherein it is erroneously stated following a description of the dominant tenement that the property "herein conveyed" is a part of the tract described; and,

finally, considering the aforementioned extrinsic evidence, it is clear that the dominant tenement which both the grantor and grantee had in mind, in each and every instance, was and had to be—Middleton Tract. Our finding in this regard is warranted by all of these factors and is compelled by fairness to all of the property owners currently residing within the tract. These property owners purchased their property in reliance on the fact that there was a general plan designed to preserve the natural beauty of the area. To hold otherwise would lead to an inequitable result.

Accordingly, it is our holding that the third element of *Werner* has been met as well and that the restrictive covenant restricting the use of defendants' land exclusively for residential purposes is enforceable as an equitable servitude.

Defendants argue that the servitude as applied to them, does not benefit the other parcels in the tract. We find defendants' argument in this regard disingenuous. As already noted, defendants' holdings in the tract comprise approximately 144 acres of land. The visual and noise impact that logging of the property would have in relation to the tract in general is apparent.

V

We need not labor long over defendants' final two arguments inasmuch as they are totally lacking in merit. Defendants maintain that commercial logging is not inconsistent or incompatible with the residential use of the lots. They further assert that it is inequitable and unjust to enforce the deed restriction against logging.

As to defendants' first contention, the covenant at issue specifically states that the land is to be used "for residence purposes exclusively" and that "no building or structure pertaining to or for the conduct of business of any kind whatsoever shall ever be erected thereon." It is apparent from the wording of this covenant that what the parties intended thereby to ban, was any kind of business activity. This is in keeping with the interpretation courts generally place on the phrase "residential purposes." (See *Seaton* v. *Clifford* (1972) 24 Cal.App.3d 46, 51 [100 Cal.Rptr. 779]; and *Weber* v. *Graner* (1955) 137 Cal.App.2d 771, 776 [291 P.2d 173].) And as much as defendants try to argue their way around the clear meaning of this restriction, they cannot. Commercial logging is exactly that—commercial. Nor does the fact that logging is temporary in nature, make any difference. As pointed out by plaintiffs, the impact from the logging is not temporary.

Regarding the inequities of the situation, it would seem that the equities are on the side of plaintiffs given the fact that at the time defendants

purchased their property, they signed a statement acknowledging the restriction against logging.

The judgment is affirmed.

White, P. J., and Strankman, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 30, 1990.