[No. B187273. Second Dist., Div. Eight. Nov. 29, 2007.]

JUANITA RICHESON et al., Plaintiffs and Respondents, v.
HAQUE HELAL et al., Defendants and Appellants.

## COUNSEL

Harding Larmore Mullen Jakle Kutcher & Kozal, Christopher M. Harding and Kenneth L. Kutcher for Defendants and Appellants.

Marsha Jones Moutrie, City Attorney, and Barry Rosenbaum, Deputy City Attorney, for City of Santa Monica as Amicus Curiae on behalf of Defendants and Appellants.

Dawson Tilem & Gole, Mitchell J. Dawson and Gary M. Gole for Plaintiffs and Respondents.

## OPINION

**FLIER, J.**—In this action, respondents Juanita Richeson and Eugene Kallman seek to compel the closure of Fair Market, a neighborhood market in Santa Monica, California built in the 1920's and presently owned and operated by appellants Haque and Bakul Helal. Since the 1970's the market has operated in a store building located at the front portion of the property in question pursuant to a series of conditional use permits. Each of the permits was of a specified duration, subject to extension by the City of Santa Monica (City) after a lengthy public review process. In 2003, the City extended the use permit without a durational limitation, allowing the market to operate indefinitely subject to certain conditions.

Respondents supported the last permit extension before both the planning commission and city council. However, after learning the permit was of indefinite extension, respondents brought suit to compel closure of the market based on two written instruments drafted, executed and recorded at the City's behest in the late 1980's, when it approved two onsite condominiums, one now owned by appellants (unit one), the other by respondents (unit two).[1] The first document is a regulatory agreement entitled "Agreement Imposing

---

[1] Since approval of the two condominiums in the late 1980's, the City has reconsidered its land use policy and regulations for neighborhood markets. Rather than requiring that they

Restrictions on Real Property" (AIR) entered between the City and the then property owner. The other document is entitled "Declaration of Covenants, Conditions, Restrictions and Reservation of Easements" (CC&R's).

The trial court issued a permanent injunction based on its interpretation of these documents. Appellants claim this was error on four grounds, any one of which requires a reversal, namely: (1) the trial court erroneously construed the AIR and CC&R's as compelling Fair Market's closure regardless of intervening changes in City zoning and permits for the market; (2) the trial court's interpretation of the AIR and CC&R's violates the constitutional rule that cities may not contract away their police powers to enact future changes in their land use regulations; (3) respondents' suit is barred by the applicable statute of limitations; and (4) the trial court erred in issuing a mandatory injunction compelling Fair Market's closure because injunctive relief is not available when contrary to public policy.

We reverse the judgment and hold the trial court erroneously construed the AIR and CC&R's as compelling the Fair Market's closure regardless of intervening changes in City zoning and permits for the market and, were it otherwise, the AIR and CC&R's would constitute an invalid attempt by the City to surrender its police power. In light of that holding, we do not reach appellants' other contentions. Because the judgment is reversed, the award of attorney fees and costs must also be reversed.

## FACTS

Both appellants and respondents acquired their interest in the property relatively recently. Respondents purchased their condominium in 1994. Appellants leased the market in 1995 and purchased their condominium, which included the market, in March 2003.

The relevant background of the present dispute is as follows. The market was built in 1928, a year before the property was first zoned. At that time, the City zoned the land "Class B—Income." After World War II, the City experienced a building boom, and in 1946 the property was rezoned to "R2," making operation of the market a nonconforming use. Two years later, the city council adopted an ordinance requiring all commercial uses to be removed from residential zones within 25 years. However, in this case, when the 25-year time period expired in 1973, the City issued a conditional use permit allowing Fair Market to continue in operation for an additional three years. In 1976 and 1979, the City extended the permit for three years and five years, and it extended the permit again in 1984.

---

eventually be closed, City zoning now preserves and protects these local markets as positive neighborhood amenities consistent with contemporary planning principles.

In 1985, the City approved "CUP 381," which allowed Fair Market to be located in what was then an "R3" zone. The permit was effective through October 23, 2000, a date chosen "to coincide with the Planning horizon of the current Land Use Element." The date at that time was the maximum the City zoning ordinance allowed conditional use permits to be extended for nonconforming markets in residential districts.

In 1987, the property owner sought to build two condominiums at the rear of the property behind Fair Market. Under the land use regulations then in effect, the condominiums could not be built without tearing down the market. However, on April 28, 1987, the city council approved "Parcel Map 18025" and "CUP 435," which allowed the market to remain and the rear portion of the property to be developed with the two condominiums. Special condition 1 of CUP 435 required the existing market building to be made part of the common area and provided for CC&R's allowing ownership of the market to be tied to one of the condominium units and, at such time as the market is removed or destroyed, the store area to be landscaped as part of the unrestricted common area. The approvals stated the market use was subject to the time limits and conditions set forth in CUP 381 and required the recording of the CC&R's.

The AIR was entered into between the City and the property owner, a predecessor in interest to the parties in this action. The AIR recites that the owner wished to construct the condominiums on the property, which "currently contains an existing, one story, non-conforming grocery store," and that "[t]he grocery store, which has a Conditional Use Permit for a retail use in an R-3 zone district (valid until October 23, 2000), would remain and is proposed for incorporation into the ownership of the front residential unit . . . ." The document further recites that the City was approving the parcel map and permit "subject to conditions which are imposed *for the public and surrounding landowners* and without which no permit would be issued." (Italics added.)

The AIR goes on to state that the existing retail store is subject to CUP 381 and, "[a]s a nonconforming building and use, the retail store is subject to Sections 9136A and 9136B of the Santa Monica Municipal Code, which establishes significant controls and restrictions on nonconforming buildings and uses including the *potential* removal of such buildings and uses."[2] (Italics added.) The AIR provides, "The store building shall be removed and the

---

[2] Santa Monica Municipal Code former section 9136A6 provided: "every non-conforming building which is designed or arranged for use permitted only in the commercial or manufacturing districts, within 25 years from November 5, 1948, shall be removed completely or altered and converted to a building conforming to all regulations of the District in which such building is located." Santa Monica Municipal Code former section 9136B1 recited that, except

underlying area shall be landscaped or redeveloped in a manner consistent with legal requirements then in effect at such time as the retail use is discontinued for a continuous period of one year, the Conditional Use Permit expires (on October 23, 2000), or the Conditional Use Permit is revoked, whichever occurs first." Further provisions require the AIR and CC&R's to be recorded and that the CC&R's include a reference to the applicable duties and obligations set forth in the AIR and be approved as to form by the city attorney prior to recordation.

The CC&R's approved by the city attorney generally track the language of the AIR but differ in certain respects. Article VI, section 1, paragraph F of the CC&R's provides: "The store and its exclusive parking area shall be part of and appurtenant to unit one of the project. The owner of unit one may conduct any lawful business in the store allowed by the present or *future conditional use permits issued by the City of Santa Monica.* The owners of unit two and the Homeowners Association shall not have the right to limit the use or to affect the conduct of the owners or managers of the store other than through the civil or criminal authority of the State of California and not through these Covenants, Conditions, and Restrictions." (Italics added.) Article XIV, section 2 of the CC&R's provides: "The existing retail store is a nonconforming building and use, *subject to the time limits and conditions set forth in conditional use permit 381.*" (Italics added.) Article XIV, section 3 further provides: "The store building shall be removed and the underlying area shall be landscaped or redeveloped in a manner consistent with legal requirements *then in effect at such time as* the retail use is discontinued for a continuous period of one year or *the Conditional Use Permit expires,* whichever occurs first." (Italics added.) This provision differs from the corresponding provision in the AIR in that article XIV, section 3 of the CC&R's does not specifically refer to the date of October 23, 2000, as the expiration of CUP 381, nor does it include revocation of the conditional use permit as an event that requires removal of the store building.

Pursuant to the parcel map and conditional use permit, the AIR was recorded on September 9, 1987, and the CC&R's were recorded on July 31, 1990. Appellants admittedly had constructive notice of the AIR and CC&R's prior to their purchase of their condominium and Fair Market.

In April 2000, an application was filed with the City to authorize the continued operation of Fair Market beyond its October 23, 2000, closure date. Respondents supported this request. More specifically, in 2000, they signed a petition requesting the planning commission to preserve the market. While

as provided in section 9136A6, "the non-conforming use of a building, existing at the effective date of this chapter, may be continued."

the application was pending, appellants bought the interest in their condominium and in Fair Market. In 2003, respondent Kallman appeared before the City on three separate occasions to testify in support of the issuance of a new permit to allow the market to remain in operation. The planning commission granted the request by approving "CUP 00-009" on April 23, 2003.[3] In granting this approval, the planning commission found that the market was a neighborhood-serving use, that it had been located at the site for more than 50 years without any adverse impact to the neighborhood's residential character, and that its close proximity to many residential units reduced the number of vehicle trips by area residents needing routine grocery items. The trial court found that respondent Kallman had been "enthusiastic" in supporting the continuation of Fair Market and that he had essentially pleaded with the planning commission and the city council to allow the market to remain in front of his property, for the good of the community and for the benefit of his property. The extension of the permit also had the overwhelming support of the neighborhood.

The city council concurred with the planning commission's view of the importance of neighborhood markets with the adoption of ordinance No. 2090 (CCS) on July 22, 2003. The ordinance allowed the planning commission or the city council on appeal to modify the permit standards for existing nonconforming neighborhood markets. In adopting the ordinance, the city council expressly found it would allow "for the continuation of nonconforming neighborhood markets which have served surrounding neighborhoods for a long period of time, which are located in the areas of the City that have an insufficient number of grocery markets and which thereby reduce the need for residents to drive to less convenient commercial locations."

CUP 00-009 was approved and became effective September 23, 2003, when the city council amended Parcel Map 18025 and CUP 435 to allow the continued operation of Fair Market consistent with ordinance No. 2090 (CCS).[4]

The planning commission subsequently approved "CUP 00-010," which altered the market's operation hours to allow the market to operate from 7:00 a.m. to 11:00 p.m. CUP 00-010 superseded CUP 00-009 and remains presently in effect.

---

[3] It is not clear from the record the reason for the City's three-year delay in acting on the extension request. It is not disputed that the application for the extension was submitted to the City well before October 23, 2000, i.e., before the "expiration" of CUP 381.

[4] Bruce Leach, the associate planner for the City who processed two conditional use permits for the property between 2002 and 2004, testified at trial in response to the court's question "What does the City want now?" that "the City wants the store to stay as long as it is a neighborhood serving . . . market, but if that use is ever terminated, that that building be removed and it comply with the original agreement on the property."

## PROCEDURAL HISTORY

In August 2004, respondents filed this action to enforce deed restrictions against appellants. The complaint sought declaratory and injunctive relief and damages for a nuisance, unjust enrichment and misrepresentation.

After a three-day trial, the trial court rendered a judgment for respondents in September 2005. The court declared that appellants may not conduct a market business on the property, the store building must be removed and the underlying area must be landscaped or developed in a manner consistent with the CC&R's. The court also issued a mandatory injunction ordering appellants to "cease operating the market known as the Fair Market . . . ." The court denied respondents any damages, finding they had not been harmed nor sustained any damages from the continued operation of Fair Market.

Appellants timely appealed from the judgment and from a postjudgment order awarding attorney fees and denying their motion to tax costs.

## STANDARD OF REVIEW

■ The interpretation of a restrictive covenant is governed by contract principles, "under which courts try 'to effectuate the legitimate desires of the covenanting parties.' [Citation.]" (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380–381 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) That is a question of law unless the interpretation turns upon the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].) When, as here, the trial court's interpretation of a writing does not turn upon the credibility of extrinsic evidence, we make our own independent interpretation of the meaning of the writing. (*Ibid.*)

When a dispute arises over the meaning of language in an instrument, the first question to be decided is whether the language is "reasonably suscep-tible" to the interpretation urged by the party. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].) If the language is not, the case is over. (*Ibid.*) If the language is reasonably susceptible to the interpretation urged, we move to the second question: what did the parties intend the language to mean? (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].)

Whether the instrument is reasonably susceptible to a party's interpretation can be determined either from the language of the instrument itself or from extrinsic evidence of the parties' intent. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798 [79 Cal.Rptr.2d 273].) If an instrument is capable of

two different reasonable interpretations, the instrument is ambiguous. (*Ibid.*) In that case, we must provide an interpretation that will make the instrument lawful, operative, definite, reasonable, and capable of being carried into effect, and must avoid an interpretation that would make it harsh, unjust or inequitable. (Civ. Code, § 1643; *National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279 [105 Cal.Rptr.2d 237]; *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].)

■ Applying such standards to this case, we conclude the AIR and CC&R's did not properly lend themselves to an interpretation that would prohibit the City from changing the permitted use or zoning and, were they so construed, the AIR and CC&R's would be invalid as an attempt by the City to surrender its future right to exercise its police power respecting the property.

## DISCUSSION

■ The state Constitution gives California cities broad and flexible power to promote the public welfare. (Cal. Const., art. XI, § 7.) The police power is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people. A city's police power under this constitutional provision is as broad as that of the state Legislature itself. (*Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876]; see *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1152 [45 Cal.Rptr.3d 21, 136 P.3d 821].)

A city's police power "is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life, and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race." (*Miller v. Board of Public Works* (1925) 195 Cal. 477, 485 [234 P. 381].) Therefore, "[a]s the congestion of our cities increases, likewise do the problems of traffic control and police, fire, and health protection. Comprehensive and systematic zoning aids [in] the successful solution of these problems and obviously tends thereby to affirmatively promote the public welfare." (*Id.* at p. 489.) Moreover, "a comprehensive zoning plan should contemplate and provide for the planning from time to time of the execution of further details, extensions, and such modifications of existing features as unforeseen changes, occurring in the civic conditions, make necessary to the perfection and perpetuation of the plan." (*Id.* at p. 496.)

In the present case, the AIR is a regulatory agreement between the City and the former property owner memorializing for the public's benefit[5] a conditional use that has since been superseded by two new use permits. Respondents contend the "clear and explicit" language of the AIR and CC&R's means that Fair Market may not continue to operate after October 23, 2000, even if the City has now extended the nonconforming use indefinitely. We disagree.

The documents, read together (see Civ. Code, § 1642), raise an ambiguity whether the AIR and CC&R's prohibit the City from extending the nonconforming use past October 23, 2000. Respondents point to language in the AIR providing that the store building "shall be removed and the underlying area shall be landscaped or redeveloped in a manner consistent with legal requirements then in effect at such time as the retail use is discontinued for a continuous period of one year, the Conditional Use Permit expires (*on October 23, 2000*), or the Conditional Use Permit is revoked, whichever occurs first." (Italics added.) The only other mention of a termination date in the AIR is in the recitals, which include a statement that "[t]he grocery store, which has a Conditional Use Permit for a retail use in an R-3 zone district (*valid until October 23, 2000*), would remain and is proposed for incorporation into the ownership of the front residential unit . . . ." (Italics added.) The termination date of retail use is mentioned in the AIR only in context of the date of termination of the existing permit (CUP 381). Nowhere in the AIR does the City agree not to extend the termination date, nor does the AIR prohibit the City from enacting future permits extending the nonconforming use. The CC&R's do not contain a termination date at all for the market and, as set forth below, expressly contemplate that the City may issue future permits for the market.

We find, moreover, that the language of the documents is reasonably susceptible to the interpretation that the AIR and CC&R's do *not* prohibit the City from exercising its police power to enact legislation concerning future use of the property and conclude that such interpretation is the one that is "lawful, operative, definite, reasonable, and capable of being carried into effect." (Civ. Code, § 1643.) We thus agree with the interpretation urged by amicus curiae the City, the only original party to the documents weighing in on the issue.

---

[5] We reject any argument of respondents that the AIR and CC&R's originated for the benefit of the owner of unit two. The AIR recites that the City was issuing the approval for the proposed development "for the public and surrounding landowners." Since the former property owner held title to the entire property at the time, the property owner was not a "surrounding landowner" for whose benefit the City was entering into the AIR and requiring the declaration of CC&R's.

■ Specifically, the AIR refers, in paragraph 1.b., to the *potential* removal of the retail store. If the parties intended, as respondents claim, that the store *must* cease operation and be demolished by October 23, 2000, the parties would have provided for the certain removal of the structure rather than referring solely to a "potential" removal. "Potential" means only "existing in possibility; capable of development into actuality." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 912; see Civ. Code, § 1644 [words of contract to be understood in their "ordinary and popular" sense].) That the store could only "potentially" need to cease operation and be removed is reinforced by the AIR's provision in the next paragraph that the store building "shall be removed and the underlying area shall be landscaped or redeveloped . . . at *such time as* . . . the Conditional Use Permit expires (on October 23, 2000) . . . ." (Italics added.) If "such time as" was intended to mean October 23, 2000, the parties could have chosen to say so. The reference to an expiration date only parenthetically is consistent with an interpretation that the date of expiration of the conditional use permit could change in the future.

■ Moreover, the language of the CC&R's and absence of any mention of the October 23, 2000, end date in the CC&R's buttress the City's interpretation of these provisions.[6] Article VI, section 1F provides that "[t]he owner of the unit one may conduct any lawful business in the store allowed by the present or *future conditional use permits issued by the City* . . . ." (Italics added.) It further provides that "[t]he owners of unit two and the Homeowners Association *shall not have the right to limit the use or to affect the conduct of the owners or managers of the store* other than through the civil or criminal authority of the State of California *and not through these Covenants, Conditions, and Restrictions.*" (Italics added.) Article XIV, section 2 of the CC&R's echoes the AIR in stating the store is a nonconforming use subject to CUP 381 and in referring to a "potential" removal of such building and use. But it departs from the AIR in omitting the October 23, 2000, claimed termination date. If that date was certain and immutable, surely the parties would have taken care to set it forth in the recorded CC&R's. If there were any doubt about the correctness of our interpretation, it was dispelled by the conduct of respondents when they supported the issuance of a new conditional use permit in 2000 and, in 2003, when respondent Kallman testified in support of the new conditional use permit. Only later did

---

[6] In its amicus curiae brief, the City states, "The AIR and the CC&Rs were not intended to have independent force and effect divorced from the underlying CUPs which controlled the operation of the market and which established the termination date. These two documents placed future owners of this site on notice as to the then current state of the law and the nonconforming status of these properties, but did not suggest that this law would be unchanging. Indeed, the CC&Rs explicitly reflect the understanding that the City might exercise its police power in the future by authorizing the continued operation of the market through future conditional use permits."

respondents take the position that the October 23, 2000, date was immutable as between the parties. "The law is well settled that the construction of a contract as shown by the acts and conduct of the parties prior to the controversy as to its meaning, is entitled to great weight. (See *Riverside Water Co. v. Jurupa Ditch Co.* [(1960)] 187 Cal.App.2d [538,] 543 [9 Cal.Rptr. 742].)" (*Automobile Salesmen's Union v. Eastbay Motor Car Dealers, Inc.* (1970) 10 Cal.App.3d 419, 424 [89 Cal.Rptr. 20].) Before the current dispute arose, respondents argued enthusiastically that the agreement reflected in the CC&R's would be furthered by extending the life of the conditional use permit. Respondents' sudden change of heart is attributable not to a new-found understanding of the "real" meaning of the documents but to changing economic interests, a factor irrelevant to our interpretation.

■ The City's zoning regulations expressly provide for modifications to both the City's zoning (see pt. 9.04.20.16 of the Santa Monica Mun. Code authorizing zoning text amendments) and conditional use permits (see pt. 9.04.20.12 of the Santa Monica Mun. Code authorizing modifications to conditional use permits). Moreover, the absence of any express freeze provision in the AIR and CC&R's is consistent with an implied reservation of the City's police powers under existing authorities. "Reservation of the police power is implicit in all government contracts and private parties take their rights subject to that reservation. [Citations.]" (*108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 196 [38 Cal.Rptr.3d 589].) Thus, courts " 'will not read into the contract[] an abrogation of the potential future exercise of the sovereign police power.' [Citation.]" (*Ibid.*) The AIR and CC&R's do not expressly restrict the City's power to legislate in the future. The AIR, and corresponding CC&R's, therefore must be read as containing an implied provision reserving the City's police power to modify its zoning regulations and conditional use permit for the property.

The trial court erred in stating in its revised statement of decision that the City could not alter the expiration date set in the AIR even if the City were to amend, which it did, the market permit to change the termination provision. The City could not contract away its police power in such fashion, and it retained a right to exercise that power to authorize extensions of the life of the market. " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citations.] It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement." (*Mott v. Cline* (1927) 200 Cal. 434, 446 [253 P. 718].) Land use regulations involve the exercise of the police power

and the right to exercise the police power cannot be contracted away in the future. (See *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546]; *108 Holdings, Ltd. v. City of Rohnert Park, supra,* 136 Cal.App.4th at p. 196; *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1778–1779 [23 Cal.Rptr.2d 305]; *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 [225 Cal.Rptr. 43]; *Carty v. City of Ojai* (1978) 77 Cal.App.3d 329, 342–343 [143 Cal.Rptr. 506].) Thus, in *Delucchi,* for example, the court construed the contract in question to allow for future zoning changes. Were it otherwise, the contract would be unconstitutional as "contracting away" the City's sovereign police power. (*Delucchi, supra,* at pp. 823–824.)

Nor could the AIR and CC&R's provide respondents with any vested right in the termination of the market use. Just as a landowner has no vested right in existing or anticipated zoning (*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d at p. 796), the owner of unit two had no vested right in the existing conditional use permit. The cases respondents cite involve private covenants voluntarily drafted by sellers for private purposes, not regulatory restrictions imposed by governmental agencies as in this case. (*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 349–350 [47 Cal.Rptr.2d 898, 906 P.2d 1314]; *Fig Garden Park etc. Assn. v. Assemi Corp.* (1991) 233 Cal.App.3d 1704, 1706–1707 [285 Cal.Rptr. 303]; *Greater Middleton Assn. v. Holmes Lumber Co.* (1990) 222 Cal.App.3d 980, 984–987 [271 Cal.Rptr. 917]; *Wilkman v. Banks* (1954) 124 Cal.App.2d 451, 455 [269 P.2d 33].)

■ Respondents argue, for the first time on appeal, that the City did not contract away its police powers but entered into a "development agreement" that benefited the then current owners and their successors and the City. However, the AIR does not purport to be a development agreement and does not meet the substantive requirements for such an agreement. As we recently discussed in *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172 [41 Cal.Rptr.3d 200], "numerous procedural and substantive limitations attend the making and performance of . . . a 'development agreement.' " (*Id.* at p. 182; see Gov. Code, § 65864 et seq.) The AIR fails to satisfy the indicia of a development agreement: " 'Particulars of the statute include requirements that a development agreement may be approved only after a public hearing [citation] and must be consistent with the general plan and any specific plan [citation], a provision permitting annual review by the governmental entity and termination for noncompliance [citation], and a statement that the agreement is subject to referendum [citation]. The statute also specifies certain provisions which may or must be included in a development agreement. [Citation.]' " (*Trancas, supra,* at p. 182, fn. 5, quoting *Santa Margarita Area Residents Together v. San Luis Obispo County*

*Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 227 [100 Cal.Rptr.2d 740].) There is no showing, for example, that the AIR is subject to periodic review, termination or referendum.

## DISPOSITION

The judgment is reversed with directions to the trial court to vacate the injunction and order granting respondents attorney fees and costs, to enter judgment for appellants and to proceed in conformance with this opinion in all other respects. Appellants are to recover their costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied December 21, 2007, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied February 20, 2008, S159738.