[No. A134191. First Dist., Div. One. Jan. 14, 2013.]

In re the Marriage of NANCY and JEFFREY FACTER.
NANCY FACTER, Respondent, v.
JEFFREY FACTER, Appellant.

COUNSEL

Garrett C. Dailey for Appellant.

Law Office of Lance A. Russell, Lance A. Russell; and Bernard N. Wolf for Respondent.

OPINION

**DONDERO, J.**—In 1994, Jeffrey and Nancy Facter[1] executed a premarital agreement providing, among other things, that none of the property acquired during the marriage would be deemed community property. Sixteen years later the parties separated and divorce proceedings were initiated. After contested proceedings, the trial court declared the premarital agreement invalid in its entirety. Jeffrey appeals, contending the trial court erred in nullifying the contract instead of severing any illegal terms and preserving the balance of the agreement. We agree and reverse.

---

[1] For clarity, "we refer to the parties by their first names, as a convenience to the reader. We do not intend this informality to reflect a lack of respect." (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2 [47 Cal.Rptr.3d 183].)

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. *Background and Pretrial Proceedings*

The parties entered into the premarital agreement (the Agreement) on November 7, 1994. The Agreement itself consists of four pages and has three sections entitled "Property Rights," "Child Support," and "Other Provisions." Attached to the Agreement are two exhibits setting forth Jeffrey's separate property (then totaling approximately $3 million), and his earnings of between $475,000 and $700,000 in each of the prior five years. Paragraph No. 1, under the Property Rights section, states that none of the property acquired during the marriage would be community property.[2] This section also purports to limit Jeffrey's postmarital financial obligations to Nancy. Paragraph No. 2 of the Agreement sets forth the property she is to receive from Jeffrey in the event of permanent separation or divorce. In it, he promised to give her $100,000, plus an additional $100,000 if the marriage lasted at least 15 years and he was a partner at his law firm for at least seven years.[3] She is also to receive: (1) "One half of any sum earned from the sale of the marital residence . . . after the return to [Jeffrey] of the downpayment [*sic*] that he made . . . and less any expenses, fees and taxes incurred in connection with that sale," (2) all of that home's furnishing, and (3) a Jaguar automobile. The Child Support section seeks to limit his future child support obligations. The parties married the day after they signed the Agreement. The marriage produced a son, who was born in March 1996.

On December 5, 2010, the parties separated.

On February 4, 2011, Jeffrey filed a response to Nancy's petition for dissolution of marriage. In the response, he requested a confirmation of the property rights as set forth in the Agreement.

On April 13, 2011, Nancy filed a motion for temporary support and fees. In a declaration accompanying the motion, she stated Jeffrey had told her he did not believe he had to pay her any spousal support.[4] He also said his

---

[2] The Agreement begins as follows: "In consideration of their sharing a home, and of their marriage, and of the promises contained in this agreement, Jeffrey Facter ('H[']) and Nancy Riter ('W') agree as follows: [¶] . . . [¶] 1. None of the property acquired during their marriage shall be community property."

[3] It appears the payment here would be $200,000 total as the marriage lasted 16 years and Jeffrey was a partner at his law firm for more than seven years during the marriage.

[4] The right to spousal support is statutory. Family Code section 4330, subdivision (a), provides: "In a judgment of dissolution of marriage or legal separation of the parties, the court may order a party to pay for the support of the other party an amount, for a period of time, that

obligation to pay child support was limited by the terms of the Agreement. She reported that during the entirety of their marriage she never worked outside the home, as Jeffrey's income allowed them "to live a life completely free of any financial stress or worry." She expressed concern that Jeffrey would rely on the Agreement in opposing her motion, and reserved the right to assert the unenforceability of the entire contract. Her attorney also filed a declaration, stating, in part, his view that the enforceability of the Agreement's property provisions were not presently before the court. He affirmed, however, that his client was not waiving her right to challenge the Agreement. He also claimed the Agreement's provisions regarding child support were invalid, and argued that the document did not contain a waiver of spousal support.

Also on April 13, 2011, Jeffrey filed a memorandum of points and authorities in response to Nancy's motion for temporary support and fees. He asserted the Agreement contains a waiver of spousal support that was "contemplated and mutually agreed to." He relied, in part, on language contained in Paragraph No. 6 in the Child Support section, which provides that nothing in his conditional commitment to continue to pay the mortgage, taxes, and insurance on the marital home "shall give rise to any other obligations to pay for the housing of [Nancy], *spousal support*, or additional sums for child support." (Italics added.) He also relied on a provision in Paragraph No. 3 of the Property Rights section, which states, in part, that the assets enumerated in Paragraph No. 2 (noted above) would "constitute [Nancy's] sole right to property acquired during the marriage ***and to support* . . . .**" (Original italics & boldface.)

On June 6, 2011, the trial court filed its temporary orders for spousal and child support, attorney fees, and costs. The issue of the validity of the Agreement was ordered bifurcated for early resolution.

On August 4, 2011, Jeffrey filed a "notice of limitation of claims at trial." In this pleading, he conceded the Agreement's provisions relating to child support were unenforceable.[5] Backing away from his earlier position, he also indicated that he would not assert the Agreement as a bar to spousal support

---

the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)."

[5] The Agreement purports to limit Jeffrey's monthly support payments to $900 per child, regardless of timeshare percentage, and also states that his child support obligations are nonmodifiable. A child's rights to future support cannot be barred by contractual agreement between parents. (*Krog v. Krog* (1948) 32 Cal.2d 812, 817 [198 P.2d 510].)

or to payment of Nancy's attorney fees.[6] Finally, he stated he would not rely on a provision in Paragraph No. 2 as grounds for reimbursement of money spent on improvements made to the marital home.[7] He warned he would seek sanctions if Nancy were to attempt to litigate the issues he was conceding.

On August 17, 2011, Jeffrey filed his trial brief. He again conceded the Agreement was unenforceable with respect to child support and attorney fees. He also clarified that although he had drafted the Agreement with the intent to provide for a waiver of spousal support, he would not seek to enforce that waiver. His stated intention in making these concessions in his August 4, 2011 pleading was to avoid trial on the validity of the remainder of the Agreement. As that effort had proved unsuccessful, he focused his arguments on Paragraph No. 1, the provision stating that none of the property acquired during the marriage would be deemed community property. He further argued that the severability clause in the Agreement required the property provisions of the contract to be honored, notwithstanding the admittedly invalid provisions concerning child support and attorney fees.

On August 18, 2011, Jeffrey filed a motion in limine in which he claimed the issues of the spousal support waiver, child support, and attorney fees were "irrelevant" because they had been removed "from the case."

The trial on the bifurcated issue of the validity of the Agreement was heard on August 22 and 23, 2011.

II. *The Trial*

A. *Nancy Facter*

Nancy testified that she met Jeffrey in 1990. At that time, she had a part-time job at Nordstrom's and Jeffrey was working at a law firm. As their relationship progressed, Jeffrey gave her financial support, including buying her a used car and giving her money to take a real estate licensing course. When she stopped working shortly before their marriage, he paid all the living expenses for her and for her two children from a prior marriage. He never asked to be reimbursed for any of these expenses. They decided to

---

[6] The Agreement contains a provision stating that each party shall pay his or her own attorney fees, costs, and legal expenses incurred in connection with any issue regarding the dissolution of the marriage or any litigation over the Agreement.

[7] As noted above, Paragraph No. 2 of the Agreement states that in the event of permanent separation or divorce Nancy would receive a specified lump sum as well as half the profits from the sale of the marital home, less Jeffrey's downpayment and "*any expenses*, fees and taxes incurred in connection with that sale." (Italics added.)

purchase a home together in the spring of 1994, prior to their marriage. Both of their names are on the title to the property.[8]

Jeffrey wanted to have a child but Nancy told him she would not do so outside of marriage. Around the time they purchased their home, he told her he was afraid of marriage because he had worked hard all his life, had earned a lot of money, and wanted all that he had earned prior to marriage to be protected. He asked if she would sign a prenuptial agreement. She said she understood that he needed to protect his prior earnings, but told him she would not enter into a marriage unless the union was a "partnership" without separate finances. He assented and said he would prepare an agreement. When he gave her the draft of the Agreement he told her to take it to a family law attorney who would explain it to her, but advised her that absolutely no changes could be made to the document. He did not discuss any of its provisions with her.

Nancy showed the draft Agreement to an attorney in San Francisco whose name she could not recall, as well as an attorney in San Rafael named Charlotte Huggins. Huggins took a few minutes to review the document and told her the child support section was contrary to California law because any decisions regarding child support would be determined by the court. She advised Nancy that the Agreement did not contain a waiver of spousal support or attorney fees. She also noted that if the marital home was sold in the event of a divorce, Jeffrey would receive a refund of his downpayment, as well as any expenses relating to the sale of the house. After that, they would split the profits from the sale. She also told Nancy any earnings or funds that were put into joint accounts would be considered joint funds. Nancy paid Huggins a fee and never saw her again. The entire meeting took less than 30 minutes.

Nancy and Jeffrey signed the Agreement just before their wedding. They never discussed the Agreement's terms.[9] She signed it because she believed it protected her interests in that if the marriage failed she would receive spousal support and half of the value of the marital home, and would have a joint interest in the money he had earned during marriage because she understood all his earnings would be held jointly. Had she known Jeffrey would claim all his earnings during marriage were his sole and separate property, she would not have signed the Agreement. She also would not have signed it if she had known he was going to claim it entitled him to reimbursement for the almost $2 million spent on remodeling the marital home.

---

[8] The deed to the home reflects that the parties hold the property as joint tenants.

[9] In his trial brief, Jeffrey accused Nancy of having committed fraud when she signed the Agreement because she failed to disclose her knowledge that it contained some unenforceable provisions. He claimed evidence of Nancy's alleged fraudulent intent both impugned her credibility and proved she signed the Agreement voluntarily.

Nancy testified the parties agreed their marriage would be "very traditional" in that she would be a stay-at-home mom, take care of the house, and support him in his career. Jeffrey told Nancy he made more than enough money to provide for the family and she would never have to worry about money again. During the marriage, he controlled their finances. Whenever she asked him if he was keeping any of his earnings as separate property he would deny doing so. He always said his money was "our money." They also had several joint accounts.

On cross-examination, Nancy admitted she read the entire Agreement before she signed it. With respect to her understanding of Paragraph No. 1, she testified she was advised that any earnings held jointly would be owned jointly. Since the parties had agreed Jeffrey's income would be held jointly during marriage, she understood that she would have a joint interest in all of his earnings. She acknowledged they did not have a written agreement that he would deposit all of his earnings into joint accounts. She testified her attorneys did not tell her the Agreement's integration clause would make any oral promises unenforceable.[10] She agreed no undue influence was placed on her to sign the Agreement. She also knew the Agreement could only be modified in writing, and that it contained a severability clause, which she also read and understood.

## B. *Charlotte Huggins*

Attorney Charlotte Huggins testified she had no recollection of having consulted with Nancy, and had no notes or files from 1994. If a client had asked her to review a prenuptial agreement in 1994, she would have gone over the document with the client and explained the legal meaning of its provisions. As to whether she would have advised a client to refrain from telling his or her prospective spouse that any part of the agreement was legally invalid, Huggins testified she had no recollection of what she would have done in 1994.

## C. *Jeffrey Facter*

. Jeffrey graduated from Harvard Law School and has been a partner at his current law firm since 1989. His areas of concentration are securities and corporate governance litigation. When the couple first met, Nancy was selling shoes at Nordstrom's. She did not like that job and wanted to get a real estate license. He paid for her to take a course and she passed the exam and

---

[10] The integration clause provides: "This agreement is fully integrated and sets forth the entire understanding of the parties. Neither party has made any representation to, or relied upon any representation by, the other party except those representations set forth in this agreement."

obtained her license. She later decided she did not want to be a real estate agent. During this time, she was involved in divorce litigation with her prior husband. For a layperson, she was very savvy about the laws on community property, support, and support arrearages. She also knew about things like DissoMaster, which he had never heard of before.[11]

Before they married, they purchased a home in Mill Valley. Title to the house was taken in joint tenancy, though Nancy did not contribute any money towards the purchase. When they discussed getting married, Jeffrey explained to her that he had worked hard to get where he was in his career and could not go forward with a marriage unless his earnings would be legally his. He also told her he did not want to have any continuing financial obligations to her if their marriage ended. However, he reassured her that as long as they were married she could spend his earnings as she chose. He would not have any rules about spending and would not be watching her. When she assented, he was relieved and told her he would write something up. He thus had two goals in drafting a prenuptial agreement: "First, I needed an agreement that the earnings during the marriage would be legally mine." He wanted Nancy to promise that all property acquired during the marriage, including profit distributions from his firm and investment earnings, would not be community property. He sought to convey this concept in Paragraph No. 1 of the Agreement. Secondly, he wanted to preclude any postmarital payments to Nancy, apart from those set forth in the Agreement.

When he drafted the Agreement, Jeffrey had no family law expertise and he did not consult with a family law attorney. He also did not do any legal research on family law because he wanted only a very basic agreement that would cover his two primary issues. He thought the language of the Agreement was simple and straightforward, and he assumed if anything was amiss Nancy's attorney would bring it to his attention. When the trial judge asked Jeffrey whether he would have entered into the marriage had he known he would later have to abandon the spousal support waiver, he answered, "I would not have, your Honor. The spousal support waiver was hugely important to me. Not as important as my earnings during the marriage, but this sort of open-ended paying money to someone who walked out on me, or may walk out on me, that was a nightmare to me. And I would not have done that."

After Jeffrey drafted the Agreement, he gave it to Nancy and told her to get independent legal advice from a family law attorney. He denied telling her the document could not be modified, but he did tell her two aspects of it

---

[11] Nancy testified that her previous marriage had lasted for eight years. When she got divorced, she and her former husband went through the court system. During the proceedings, there were disputes regarding support and attorney fees.

could not be altered. Specifically, Paragraph No. 1 was nonnegotiable. Paragraph No. 2, while negotiable, would set forth all that Nancy would receive in lieu of community property and spousal support in the event the marriage failed. He denied promising her at that time that he would put all of his earnings into joint accounts. He also denied telling her the only purpose of the Agreement was to protect his existing separate property. He understood it is not necessary to have a prenuptial agreement to protect property that is separately owned prior to marriage. Instead, such agreements are used to clarify whether earnings acquired during marriage are going to remain separate property. She never indicated to him that she did not believe the Agreement was binding.

Jeffrey affirmed that, with his assent, Nancy never worked for compensation during the marriage. He told her he would take care of her financially for as long as they were together. For the first four years of their marriage, the parties had separate bank accounts. Beginning in 1998, they opened a few joint accounts. One of the accounts was used to pay for the home remodeling project. They made it a joint account so that Nancy would be able to write checks to the contractors.[12] They also opened a joint checking account to cover day-to-day household expenses. Around 2007, Nancy started pressuring him to put more assets into joint accounts. This was when she first said she wanted to feel more like an economic partner in the marriage. They talked it over and he agreed to put everything he earned into joint accounts. She took over paying all of their bills. In his mind, all his earnings were still his separate property, but he put the money into joint accounts because it was important to her that she run the household finances.

### III. The Trial Court's Ruling

On October 14, 2011, the trial court orally announced its tentative decision, declaring the spousal support waiver to be unconscionable and finding the Agreement inseverable and unenforceable in its entirety.

On October 28, 2011, Jeffrey filed his objections to the trial court's tentative decision.

On November 28, 2011, the trial court filed its statement of decision, affirming its tentative ruling. This appeal followed.

---

[12] At trial, Jeffrey denied asserting that the word "expenses" in Paragraph No. 2 of the Agreement entitled him to recoup the costs of improvements made to the marital home. However, he believed reimbursement would be authorized under Paragraph No. 1 because the improvements had not been funded with community property.

## DISCUSSION

On appeal, Jeffrey contends the allegedly invalid spousal support waiver provided no legal basis for the trial court's refusal to enforce the property-related provisions of the Agreement. Although we disagree in some respects with the court's analysis, we agree the Agreement contains an invalid, unconscionable waiver of spousal support. We concur with Jeffrey, however, that the court erred in refusing to sever the Agreement's invalid provisions from the balance of the contract.

*The Spousal Support Waiver*

### A. The Agreement Contains a Waiver of Spousal Support

We first address Jeffrey's claim that the trial court erred in presuming the Agreement contains a waiver of spousal support. His argument is based on the assertion that there is no waiver because the document does not contain a *"legally effective* waiver of spousal support." (Italics added.) He also asserts the court predicated its ruling on "an impermissible application of the doctrine of judicial estoppel" because, by the time of trial, he had reversed his earlier position and decided he would no longer seek to enforce the waiver against Nancy. His arguments lack merit.

■ We first observe that the trial court's duty was to interpret the Agreement itself, not Jeffrey's 180-degree turn away from his prior position. "The interpretation of a written instrument is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*In re Marriage of Smith* (2007) 148 Cal.App.4th 1115, 1120 [56 Cal.Rptr.3d 341].) In interpreting a written agreement, we "look first to the language of the contract . . . to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) The intent is to be inferred, if possible, *solely from the written provisions of the contract.* (Civ. Code, § 1639.) Language in a contract must be interpreted as a whole and in the circumstances of the case, and cannot be deemed ambiguous in the abstract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see Civ. Code, §§ 1641, 1647.)

As noted above, Paragraph No. 2 spells out what Nancy is to receive in the event of divorce, including cash and half the profits from the sale of the

marital home. Paragraph No. 3 contains the spousal support waiver: "The provisions of paragraph 2, *supra*, constitute [Nancy's] sole right to property acquired during the marriage *and to support*, and replace or supersede any entitlement to such property that [Nancy] might otherwise have under law." (Italics added.) Jeffrey contends his use of the word "support" rather than "spousal support" created "some ambiguity as to the meaning of 'support.' " Relying on *In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 469 [204 Cal.Rptr. 568, 683 P.2d 248] ("where there is an ambiguity in the language of a marital property agreement it must be decided in favor of the right to spousal support"), he further asserts that opinion "precludes finding that there is a waiver of spousal support in the Agreement."[13] However, as he admits, he not only "intended to achieve a waiver of spousal support" when he drafted the Agreement, he initially asserted this waiver in opposition to Nancy's motion for temporary spousal support.

Even if the word "support" as it appears in Paragraph No. 3 is ambiguous, we would interpret it as referencing spousal support. In general, an ambiguous or uncertain provision of a contract "must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.) " '[W]here the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract.' " (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544 [54 Cal.Rptr.2d 128], quoting *Floystrup v. City of Berkeley Rent Stabilization Bd.* (1990) 219 Cal.App.3d 1309, 1318 [268 Cal.Rptr. 898].) If extrinsic evidence is admitted to interpret an ambiguous contract but that evidence is undisputed and the parties draw conflicting inferences, a reviewing court independently draws inferences and interprets the contract. (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723]; *Richeson v. Helal* (2007) 158 Cal.App.4th 268, 276 [70 Cal.Rptr.3d 18]; *Frankel, supra*, at p. 546.)

The only other meaning that could be ascribed to the word "support" in Paragraph No. 3 would be that it references *child* support. However, the Agreement specifically addresses child support in another section.[14] Moreover, Paragraph No. 3 appears under the heading "Property Rights," which clearly is intended to define the property rights as between Jeffrey and Nancy. Paragraph No. 2, which is cross-referenced in Paragraph No. 3, pertains

---

[13] In any event, *Vomacka* is inapposite. That case concerned the interpretation of a stipulated separation agreement that was incorporated into the parties' interlocutory judgment of dissolution of marriage. Thus, it did not concern waivers of spousal support in premarital agreements.

[14] As noted previously, spousal support is also referenced in Paragraph No. 6, which is contained in the section on child support.

entirely to Nancy's property rights. Thus, we have little difficulty in concluding the word "support" in Paragraph No. 3 represents a waiver of spousal support.[15]

## B. *Spousal Support Waivers Executed in 1994 Are Not Illegal*

Jeffrey asserts the trial court erred in concluding the spousal support waiver was illegal as a matter of law when the Agreement was executed in 1994. We agree the court's analysis on this point is flawed.

The trial court found that when the Agreement was signed, "the spousal support waiver was illegal" per *In re Marriage of Higgason* (1973) 10 Cal.3d 476 [110 Cal.Rptr. 897, 516 P.2d 289] (*Higgason*) "and dicta" in *In re Marriage of Dawley* (1976) 17 Cal.3d 342 [131 Cal.Rptr. 3, 551 P.2d 323] (*Dawley*).[16] Our Supreme Court has described *Higgason* as follows: "At issue in *Higgason* was an agreement in which both husband and wife waived all interest in the property of the other party as well as the right to support. The court concluded that a purported waiver was invalid as against public policy insofar as the agreement sought to alter the wife's statutory obligation to support the husband during marriage. The court also held that the agreement did not preclude exercise of the court's discretionary power to award postdissolution support. [Citation.] Although the basis for the latter holding is not made clear in the opinion, it appears to be that married persons assume, by means of the marriage contract, an obligation for support that continues throughout the lifetime of the parties regardless of whether they live together or apart, and any agreement to waive that obligation is also unenforceable." (*Pendleton, supra*, 24 Cal.4th 39, 46.)

In *Pendleton*, our Supreme Court essentially overruled *Higgason* and held that spousal support waivers in premarital agreements are not invalid per se. (*Pendleton, supra*, 24 Cal.4th 39, 53.) The court noted that the Uniform Premarital Agreement Act (Fam. Code, § 1600 et seq.; UPAA) was enacted in California in 1985 (12 years after *Higgason* was decided), and that its provisions expressly apply to premarital agreements. (*Pendleton, supra*, at pp. 43, fn. 3, & 44; Fam. Code, § 1610 et seq.)[17] The premarital agreement at

---

[15] Candidly, the language on this point in the Agreement is less than ideal. We note a much more straightforward waiver is found in the case of *In re Marriage of Pendleton and Fireman* (2000) 24 Cal.4th 39, 41 [99 Cal.Rptr.2d 278, 5 P.3d 839] (*Pendleton*): " '[B]oth parties now and forever waive, in the event of a dissolution of the marriage, all rights to any type of spousal support or child support from the other . . . .' "

[16] In *Dawley*, the parties had agreed before marriage that the earnings and property acquired during marriage would be held as separate property. The high court concluded *Higgason* had erred in stating that premarital agreements must be made in contemplation that the marriage will continue throughout the lifetime of the parties. (*Dawley, supra*, 17 Cal.3d 342, 352.)

[17] All further statutory references are to the Family Code except as otherwise indicated.

issue in *Pendleton* was executed in 1991 (*Pendleton, supra,* at p. 41), three years before Nancy and Jeffrey entered into the Agreement. Thus, under the trial court's reasoning, the Supreme Court should have held the waiver of spousal support contained therein was illegal under *Higgason*. Instead, the Supreme Court held that waivers of spousal support are not invalid per se:[18] "[W]hen entered into voluntarily by parties who are aware of the effect of the agreement, a premarital waiver of spousal support *does not offend contemporary public policy*. Such agreements are, therefore, permitted under section 1612, subdivision (a)(7), which authorizes the parties to contract in a premarital agreement regarding '[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.' " (*Pendleton, supra,* at p. 53, italics added.) Thus, the trial court in the present case erred in relying on *Higgason* as the basis for invalidating the Agreement's spousal support waiver.

## C. *Whether the Spousal Support Waiver Is Unconscionable*

We turn to whether the Agreement's spousal support waiver is unconscionable. We apply a de novo standard of review. (See former § 1615, subd. (b) ["An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."].) The trial court found the spousal support waiver to be unconscionable under section 1612, subdivision (c), and *Pendleton.*[19] We observe the appellate court in *In re Marriage of Howell* (2011) 195 Cal.App.4th 1062 [126 Cal.Rptr.3d 539] (*Howell*) issued an opinion on May 24, 2011, holding that the 2002 amendment to section 1612, subdivision (c), does not apply retroactively.[20] (*Howell, supra,* at p. 1077.) As noted, the trial in the instant case was held in August 2011 and the statement of decision was filed on November 28, 2011. Accordingly, per *Howell*, the court's reliance on section 1612, subdivision (c), was misplaced.

---

[18] We note the trial court's statement of decision also references *Pendleton*.

[19] The trial court's statement of decision references both section 1612, subdivision (c), and section 1615, subdivision (c). It appears the court intended to rely on current section 1612, subdivision (c) only, as former section 1615 does not contain a subdivision (c), and subdivision (c) of current section 1615 pertains to voluntariness, not to unconscionability.

[20] Section 1612, subdivision (c), currently provides: "Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, or if the provision regarding spousal support is unconscionable at the time of enforcement. An otherwise unenforceable provision in a premarital agreement regarding spousal support may not become enforceable solely because the party against whom enforcement is sought was represented by independent counsel."

We note the Supreme Court in *Pendleton* did not set a precise standard for when a spousal waiver is deemed unconscionable.[21] However, the opinion is instructive: "We need not decide here whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust. It is enough to conclude here that no public policy is violated by permitting enforcement of a waiver of spousal support executed by intelligent, *well-educated* persons, *each of whom appears to be self-sufficient in property and earning ability*, and both of whom have the advice of counsel regarding their rights and obligations as marital partners at the time they execute the waiver. Such a waiver does not violate public policy and is not per se unenforceable . . . ." (*Pendleton, supra*, 24 Cal.4th 39, 53–54, fn. omitted, italics added.)

In *Pendleton*, the wife, who held a master's degree and was an aspiring writer, sought spousal support in spite of a waiver of such support contained in the parties' premarital agreement. At the time the dissolution petition was filed, each party had a net worth of approximately $2.5 million. (*Pendleton, supra*, 24 Cal.4th 39, 42.) Our Supreme Court found the waiver to be valid, observing that the premarital agreement contained an acknowledgement that "each party had been represented by independent counsel in the negotiation and preparation of the agreement, that counsel had advised each of the meaning and legal consequences of the agreement, and that each party had read and understood the agreement and its legal consequences. Their respective counsel certified that this had been done and that their clients understood the meaning and legal consequences of the agreement and executed it freely and voluntarily." (*Id.* at p. 41.)

Similarly, in *Howell*, the parties had comparable net incomes when they executed their premarital agreement in 1999. (*Howell, supra*, 195 Cal.App.4th 1062, 1065.) The trial court had ruled that the wife failed to prove the agreement was unconscionable, finding the parties had made " 'fair, reasonable and full' " (*id.* at p. 1069) disclosures of property within the premarital agreement. Additionally, the trial court in that case had found there was not a great disparity in the income of the parties and their respective assets at the time they entered into the premarital agreement, which established there was not "any significant inequality of bargaining power." (*Id.* at p. 1080.) The

---

[21] Former section 1615 (pertaining to unenforceable premarital agreements) applies to premarital agreements as a whole and does not specifically reference spousal support waivers. Accordingly, we rely primarily on case law in evaluating whether the waiver in the Agreement is unconscionable. (See *Pendleton, supra*, 24 Cal.4th 39, 48–49 ["The most reasonable understanding of the Legislature's purpose when it omitted [the UPAA's spousal support language from section 1612's list of permissible objects of a premarital agreement] is that it was satisfied with the evolution of the common law governing premarital waivers of spousal support and intended to permit that evolution to continue."].)

appellate court affirmed the trial court's conclusion that the spousal support waiver contained in the agreement was not unconscionable.[22]

▉ Unlike the wife in *Pendleton*, Nancy was not a "well-educated person, self-sufficient in property and earning capacity," at the time that she entered the Agreement. Rather, she was a recently unemployed high school graduate with two minor children, living rent free in the home Jeffrey had financed for them. In contrast, Jeffrey was an accomplished attorney, a graduate of Harvard Law school who earned roughly half a million dollars a year and had $3 million of separate property at the time of the marriage, including a home in Tiburon. Nancy had no property of her own. Thus, unlike circumstances in *Howell*, here there was a great disparity in the parties' respective incomes and assets at the time they entered into the Agreement. This factor also suggests a "significant inequality of bargaining power" (*Howell, supra*, 195 Cal.App.4th 1062, 1080), an inference that is further supported by the fact that Jeffrey not only drafted the Agreement himself but also told her that the spousal support waiver could not be negotiated.

The Supreme Court in *Pendleton* also suggested that circumstances existing at the time of the enforcement of a spousal support waiver "might make enforcement unjust." (*Pendleton, supra*, 24 Cal.4th 39, 53.)[23] The marriage in the present case lasted 16 years, during which Nancy, with Jeffrey's assent, did not pursue her education or seek gainful employment. Instead, she devoted her efforts to child rearing and maintaining the family home, while Jeffrey continued to successfully pursue a financially rewarding career. Without reasonable spousal support, the evidence supports the conclusion that Nancy will never come close to replicating the marital standard of living. As noted above, under Paragraph No. 2 of the Agreement, she will receive a cash payment of $200,000, half of which Jeffrey has the option of paying in undefined increments over a five-year period. In addition, she will receive half of the net proceeds from the sale of the marital home (an amount that cannot be determined at this time), along with the home's furniture and a Jaguar automobile. Compared to what she is likely to receive in court-ordered

---

[22] The waiver provided: " 'The parties mutually waive any right to receive future spousal support, maintenance or alimony from the other in the event of a Dissolution of Marriage or Legal Separation.' " (*Howell, supra*, 195 Cal.App.4th 1062, 1066–1067.)

[23] The appellate court in *Howell* held that former section 1615, subdivision (a)(2), requires unconscionability to be evaluated solely at the time of the waiver's execution as section 1612, subdivision (c), was not intended to apply retroactively and the later statute specifies that unconscionability of a spousal support waiver is to be evaluated at the time of enforcement. (*Howell, supra*, 195 Cal.App.4th 1062, 1078, fn. 11.) We observe this holding was based primarily on the revised statute's requirement that a party be represented by counsel, not on the provision allowing for evaluation of unconscionability at the time the waiver is to be enforced. (*Id.* at p. 1077.)

spousal support, these assets are manifestly inadequate.[24] Given that Jeffrey's self-reported separate property is now in excess of $10 million and his earnings $1 million per year, whereas Nancy amassed no separate property during the marriage and has no income at all, we have little difficulty in concluding that the Agreement's spousal support waiver is presently unconscionable.[25]

### D. Whether the Spousal Support Waiver Renders the Agreement Unenforceable

Jeffrey claims the trial court erred in concluding that the unconscionable spousal support waiver renders the entire Agreement unenforceable. We agree.

Because the agreement was executed in 1994, we apply the version of section 1615 that was in effect at that time. Former section 1615, subdivision (a), provides: "A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed and, before execution of the agreement, *all of the following* applied to that party: [¶] (A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party. [¶] (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided. [¶] (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." (Italics added.)

As Jeffrey correctly notes, unconscionability upon execution does not, standing alone, render a premarital agreement unenforceable under former section 1615. To render an agreement unenforceable, the contesting spouse also must have lacked actual or constructive knowledge of the assets and obligations of the other party, unless that spouse waived knowledge of such assets and obligations. Pursuant to former section 1615, "a premarital agreement will be enforced unless the party resisting enforcement of the agreement can demonstrate either (1) that he or she did not enter into the contract voluntarily, or (2) that the contract was unconscionable when entered into *and* that he or she did not have actual or constructive knowledge of the assets and obligations of the other party and did not voluntarily waive knowledge of

---

[24] On June 6, 2011, the trial court ordered monthly temporary guideline spousal support in the amount of $21,757 per month, along with temporary child support of $5,983 per month.

[25] We note Jeffrey arguably forfeited this issue when he stated in his "notice of limitation of claims at trial" that he would not claim that the Agreement waived spousal support.

such assets and obligations." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 15 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*); see former § 1615, subd. (a)(2).)

Nancy does not claim she entered into the Agreement involuntarily. Accordingly, former section 1615, subdivision (a)(2), applies and the trial court had to find both unconscionability *and* an absence of fair and reasonable disclosure of Jeffrey's premarital assets in order to deem the entire Agreement unenforceable. The trial court concluded that Jeffrey violated this provision by failing to list the jointly held marital home as his separate property.[26] We do not view this circumstance as constituting a failure to provide fair and reasonable disclosure. In the first place, it would have been rather odd to list a home held in joint tenancy as one's separate property. In any event, the Agreement specifically discloses the existence of the home in Paragraph No. 2, including the fact that Jeffrey had paid the downpayment, and that he would be entitled to reimbursement of that payment. There is nothing in the record to suggest Nancy was unaware of these facts, and she does not claim that Jeffrey failed to disclose any other asset. Thus, there was no evidence that she lacked "an adequate knowledge" of Jeffrey's property and financial obligations within the meaning of former section 1615, subdivision (a)(2)(C). Accordingly, as Jeffrey's property interests were fully disclosed to her, the dual requirements of former section 1615, subdivision (a)(2), have not been satisfied and the agreement as a whole is not unenforceable.

E. *Severance*

 Jeffrey claims the trial court erred in refusing to sever the Agreement's invalid provisions from those affecting the parties' property rights, particularly from the provision stating that none of the property acquired during the marriage would be community property. As noted above, the Agreement contains a severability clause: "If any clause or provision of this agreement should be determined to be wholly or partly unenforceable, that determination shall not affect the enforceability of the other clauses and provisions of this agreement." In general, severability clauses "evidence the parties' intent that, to the extent possible, the valid provisions of the contracts be given effect, even if some provision is found to be invalid or unlawful." (*Baeza v. Superior Court* (2011) 201 Cal.App.4th 1214, 1230 [135 Cal.Rptr.3d 557].)

We review the trial court's ruling on severability under an abuse of discretion standard: " 'If a contract is capable of severance, the decision

---

[26] To the extent the trial court's decision was based on Jeffrey's claim that Paragraph No. 1 entitles him to reimbursement for the approximately $1.8 million the parties spent on remodeling the home, we note that issue is not before us.

whether to sever the illegal portions and enforce the remainder is a discretionary decision for the trial court to make based on equitable considerations. [Citation.]' [Citation.]" (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1157 [125 Cal.Rptr.3d 765] (*Bakhtiari*).) "In deciding whether severance is available, [our Supreme Court has] explained '[t]he overarching inquiry is whether " 'the interests of justice . . . would be furthered' " by severance.' [Citation.] 'Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.' [Citations.]" (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 996 [70 Cal.Rptr.3d 727, 174 P.3d 741] (*Marathon*).)

Civil Code section 1598 provides: "Where a contract has *but a single object*, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." (Italics added.) This section must be read in conjunction with Civil Code section 1599, which provides: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter *and valid as to the rest*." (Italics added.) Here, the Agreement had three primary objects: (1) to waive community property rights, (2) to limit Nancy's postdissolution right to support, and (3) to limit Jeffrey's child support obligations. As we have seen, the latter two objects are invalid in that they are either unconscionable or contrary to established law. This leaves the waiver of community property rights, which, based on Jeffrey's testimony, was the central purpose of the contract.

■ "By its terms, [Civil Code section 1599] applies even—indeed, only—when the parties have contracted, in part, for something illegal. Notwithstanding any such illegality, it preserves and enforces any lawful portion of a parties' contract that feasibly may be severed." (*Marathon, supra,* 42 Cal.4th 974, 991.) "Civil Code section 1599 grants courts the power, not the duty, to sever contracts in order to avoid an inequitable windfall or preserve a contractual relationship where doing so would not condone illegality." (*Id.* at p. 992.) Here, the trial court concluded the property rights section was inseverable from the rest of the Agreement, finding that "The purported waiver of spousal support is inextricably wrapped up in the property rights section of [the Agreement] and in the child support section of the document. It is a package, all interrelated." It also found the Agreement's attorney fee waiver to be illegal and inseverable from the balance of the contract. We conclude the court abused its discretion in failing to sever the

invalid provisions pertaining to spousal support, child support, and attorney fees from the property rights section of the Agreement.[27]

We first observe that "California cases take a very liberal view of severability, enforcing valid parts of an apparently indivisible contract where the interests of justice or the policy of the law would be furthered." (*Adair v. Stockton Unified School Dist.* (2008) 162 Cal.App.4th 1436, 1450 [77 Cal.Rptr.3d 62].) "The purpose of severing or restricting illegal terms rather than voiding the entire agreement is twofold: ' "to prevent parties from gaining undeserved benefit or suffering undeserved detriment . . . particularly when there has been full or partial performance of the contract [and,] more generally, . . . to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] . . . [Citation.]" ' [Citation.]" (*Bakhtiari, supra*, 195 Cal.App.4th 1135, 1157.)

■ Here, the trial court relied heavily on Civil Code section 1670.5, which provides: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [¶] (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence *as to its commercial setting, purpose, and effect* to aid the court in making the determination." (Italics added.) As shown by the language of subdivision (b), this statute is intended to apply to contracts in a "commercial setting" and not to post-UPAA premarital agreements.

Our Supreme Court has contrasted premarital agreements with commercial contracts: "A commercial contract most frequently constitutes a private regulatory agreement intended to ensure the successful outcome of the

---

[27] In a footnote in his opening brief, Jeffrey claims the trial court's "unsupported conclusion that the attorney fee waiver was not enforceable with respect to non-child-related fees was erroneous," citing to *In re Marriage of Joseph* (1990) 217 Cal.App.3d 1277 [266 Cal.Rptr. 548]. We note in his "notice of limitation of claims at trial," he specifically stated he would "not allege that [the paragraph containing the fee waiver] is a bar to awards of attorney fees to petitioner." This concession was reiterated in his closing argument below. As he has explicitly conceded the issue, we are not inclined to address it in this opinion. It is axiomatic that "A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715]; accord, *In re Marriage of Karlin* (1972) 24 Cal.App.3d 25, 33 [101 Cal.Rptr. 240], disapproved on other grounds in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561].)

business between the contracting parties—in essence, to guide their relationship so that the object of the contract may be achieved. Normally, the execution of the contract ushers in the applicability of the regulatory scheme contemplated by the contract and the endeavor that is the object of the contract. As for a premarital agreement (or clause of such an agreement) providing solely for the division of property upon marital dissolution, the parties generally enter into the agreement anticipating that it never will be invoked, and the agreement, far from regulating the relationship of the contracting parties and providing the method for attaining their joint objectives, exists to provide for eventualities that will arise only if the relationship founders, possibly in the distant future under greatly changed and unforeseeable circumstances." (*Bonds, supra*, 24 Cal.4th 1, 24–25.)

Our research has disclosed no reported appellate decisions in which a court has relied on Civil Code section 1670.5 in deciding whether to limit the enforcement of a prenuptial agreement that contains an unconscionable provision. In fact, our Supreme Court has suggested the authors of the UPAA believed statutes like Civil Code section 1670.5 are inconsistent with the purposes served by prenuptial agreements. (*Bonds, supra*, 24 Cal.4th 1, 19, fn. 7.) Code of Civil Procedure section 1859 states that "when a general and [a] particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." Here, the applicable provision, former section 1615 of the Family Code, specifically applies to premarital agreements and is inconsistent with Civil Code section 1670.5 because, as we have already explained, such agreements are unenforceable under Family Code former section 1615 only if they are unconscionable *and* there is an inadequate property disclosure. Accordingly, the trial court erred in relying on Civil Code section 1670.5 as grounds for refusing to enforce the property rights portion of the Agreement.

█ It is well established that parties may lawfully waive their rights to community property. In the context of the present case, we find the Supreme Court's opinion in *Dawley* to be instructive. In that case, the court noted it had upheld a waiver of property rights in *Higgason*, even while holding the spousal support waiver to be void against public policy: "Although our opinion in *Higgason* asserted that a valid antenuptial agreement must be made in contemplation of a marriage lasting until death, we did not attempt to determine what the parties actually contemplated at the time of the execution of the agreement. Instead, the opinion proceeds directly to examine the *terms* of the contract. Upholding the husband's waiver of property rights, we stated that 'Insofar as an antenuptial agreement relates to the disposition of the property of the respective parties, and does not seek to alter support obligations imposed by law, it will be upheld. [Citations.] Accordingly, the provisions relating to property rights in the antenuptial agreement entered into between the husband and the wife herein are valid.' [Citation.] Relying,

however, on decisions invalidating a wife's waiver of support rights because it promoted divorce, we held the same principle barred enforcement of the husband's waiver of support rights." (*Dawley, supra,* 17 Cal.3d 342, 351.) The *Dawley* court then turned to cases preceding *Higgason,* observing no decision had struck down a contract that "merely provided that the earnings and accumulations of each spouse will be held as separate property." (*Ibid.*)

Nancy contends Paragraph No. 1 is ambiguous, unintelligible and unenforceable because "it does not state therein, or anywhere else in the Agreement, what property acquired during marriage will be if it is not community property." To the contrary, this provision effectively constitutes a waiver of community property rights.[28] If the property acquired during marriage is not community property, it must be the separate property of the acquiring spouse. There is no other plausible alternative. Further, unlike Nancy, we see nothing in the language of this provision that would suggest it does not apply equally to both parties.[29] We also do not agree that the document is fatally ambiguous because it does not address property held in joint tenancy. The status of the marital home, the parties' primary joint asset, has yet to be addressed in these proceedings and we express no opinion on that issue.

Nancy also relies on *Yoo v. Robi* (2005) 126 Cal.App.4th 1089 [24 Cal.Rptr.3d 740] and *Chiba v. Greenwald* (2007) 156 Cal.App.4th 71 [67 Cal.Rptr.3d 86] in arguing the trial court did not abuse its discretion in deciding the document was inseverable. Both cases involve commercial contracts and the California Talent Agencies Act, not premarital agreements. Thus, the two decisions were driven by public policy considerations that are absent from the present case. For example, in *Yoo* the appellate court upheld the lower court's refusal to sever the invalid contractual provisions, holding that "the public policy underlying the [Talent Agencies Act] is best effectuated by denying all recovery, even for activities which did not require a talent agency license." (*Yoo, supra,* at p. 1105.) Needless to say, the Agreement at issue here does not involve the Talent Agencies Act or any other public policy that would thwart the parties' reasonable expectations regarding the characterization of property acquired during the marriage. In sum, we conclude the offending provisions of the Agreement are severable from those found in the

---

[28] There is no evidence Nancy was surprised by anything contained in the relatively succinct provisions in the property rights section of the Agreement. She read the document before signing it, consulted with attorneys of her own choosing, never communicated any lack of understanding about its terms before or during the marriage, was not under duress, and voluntarily agreed to the terms in the agreement without any evidence of fraud or deceit by Jeffrey. Further, she had some understanding of principles governing family law in that she had been through divorce proceedings before.

[29] Paragraph No. 3 states, in part, that *both* parties "waive, relinquish and release any claim that each may have to the separate property of the other except as provided . . . ."

property rights section. While Paragraph No. 3 contains the invalid spousal support waiver, it easily can be excised from the property rights section.[30]

Further, we find the trial court abused its discretion when it found equitable considerations overcame the general rule in favor of promoting severance. It appears the primary reason for the court's decision was its conclusion that it is "inescapable that [Jeffrey] intended to award the joint tenancy house to himself as his separate property." Nothing in the Agreement supports this "inescapable" conclusion. The provision in question specifically states that Nancy is to receive half the net proceeds from the sale of the marital residence.

We also disagree with the trial court's assumption that total invalidation of the Agreement is nevertheless equitable as Jeffrey will not be deprived of *all* the assets he accumulated during the marriage, but is only required to give Nancy half (an amount likely to approach several million dollars). In our view, this represents an inequitable windfall to Nancy that clearly was not contemplated by the parties when they entered into the Agreement. Even Nancy testified that she believed she would only be entitled to share in Jeffrey's earnings to the extent they were placed in joint accounts. Thus, the Agreement, standing alone, gave Nancy no cause to expect that she would be entitled to any of Jeffrey's marital earnings in the event of a divorce. Further, the trial court's result causes Jeffrey to suffer an undeserved detriment in that he clearly intended for his earnings and accumulations during marriage to remain his separate property and, in drafting the Agreement, he did nothing to hide this intention from Nancy.

We also question the trial court's reliance on its perception that the Agreement, as a whole, is "disingenuous, one-sided, and unfair." In the context of prenuptial agreements, fairness, for better or worse, is not the touchstone. Instead, the focus is on disclosure of assets. As the Supreme Court noted in *Bonds*, in drafting the UPAA, "it was settled that the party against whom enforcement of a premarital agreement was sought *only* could raise the issue of unconscionability, that is, the substantive unfairness of an agreement, if he or she also could demonstrate lack of disclosure of assets, lack of waiver of disclosure, and lack of imputed knowledge of assets. The

---

[30] Unlike the trial court, we do not believe the Agreement must be rewritten in order to be salvaged. Paragraph No. 3 can easily be modified as follows: "The provisions of paragraph 2, *supra*, constitute W's sole right to property acquired during the marriage and to support, and replace or supersede any entitlement to such property that W might otherwise have under law. H and W waive, relinquish and release any claim that each may have to the separate property of the other except as provided in paragraph 2, *supra*." The entire invalid Child Support section can be easily deleted, as well as Paragraph No. 20, which contains the invalid attorney fee waiver.

language adopted [in section 1615] was intended to enhance the enforceability of premarital agreements and to convey the sense that an agreement voluntarily entered into would be enforced *without regard to the apparent unfairness of its terms*, as long as the objecting party *knew or should have known of the other party's assets, . . .*" (*Bonds, supra*, 24 Cal.4th 1, 16–17, original italics omitted, italics added.)

In sum, we conclude the court abused its discretion in concluding the Property Rights section is incapable of being severed from the Agreement: " 'A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order.' [Citation.]" (*Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, 1599 [127 Cal.Rptr.3d 611].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with orders to enter a new judgment not inconsistent with this opinion. The parties are to bear their own costs on appeal.

Margulies, Acting P. J., and Banke, J., concurred.

A petition for a rehearing was denied February 6, 2013, and respondent's petition for review by the Supreme Court was denied May 1, 2013, S208785.