Filed 8/14/23  Thompson v. Thompson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publi-
cation or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or or-
dered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RICHARD LEE THOMPSON,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>RHONA FOGARTY THOMPSON,<br><br>        Respondent. | A164992<br><br>(San Mateo County<br>Super. Ct. No.<br>19FAM01440) |

This is an appeal from an order made after a bifurcated "trial" on two questions pertaining to the parties' premarital agreement (PMA).  The first is whether the terms of the PMA "preclude the creation of community property pursuant to Family Code [s]ection 760 et seq., except as specifically provided in paragraphs 3, 4, 5, 6, and 7 of the [PMA]."  (Italics omitted.)  The second is whether the terms of the PMA excuse the parties' "respective duties to trace separate property claims under California community property law."  The parties treated, and the trial court considered, these two questions as legal ones of contract interpretation.

The court concluded the answer to both questions is "NO."  The court was not asked to decide the character of any particular asset (i.e., if it is community or separate property), nor did it.  Thus, unlike most cases concerning the scope and import of a PMA, which resolve concrete disputes

1

about specific assets, the trial court here was asked two broad questions, to which it provided equally broad answers. We affirm.

## BACKGROUND[1]

Rhona Fogarty Thompson, respondent in this divorce proceeding, filed a request to bifurcate and set for trial several questions, including questions concerning the interpretation of the PMA "as to the creation of community property." She maintained that she and Richard Lee Thompson (Rick),[2] petitioner in this proceeding, have "such different interpretations regarding the manner in which community property can be created pursuant to that agreement that [the two are] unable to move forward towards settlement or final judgment." Rhona phrased the community property question she wanted answered as follows: "[D]o the terms of the [PMA] preclude the creation of community property pursuant to Family Code [s]ection 760 et seq., except as specifically provided in paragraphs 3, 4, 5, 6, and 7 of the [PMA]." (Italics omitted.)

According to Rhona, Rick views the PMA as a waiving *all* Family Code provisions pertaining to community property and thus foreclosing the creation of such property "in any way other than those specified in paragraphs 3, 4, 5, 6, and 7" of the PMA. She characterized Rick's view of the PMA as establishing a "separate property presumption" which, in turn, excuses him from "tracing requirements."

To illustrate, Rhona quoted interrogatory answers Richard provided wherein he stated, "All assets acquired and investments made during

---

[1] We provide only a summary of the facts here, and discuss the specific facts, including the provisions of the PMA, in connection with our discussion of the issues raised on appeal.

[2] We refer to the parties by their first names for clarity.

2

marriage were made with my and/or Rhona's premarital assets. As such, the sources of capital for all assets acquired and investments made during marriage were either my and/or Rhona's separate property. In addition, per paragraph 1 and 2 [of the PMA], all rents, issues, profits and proceeds thereof, and all appreciation in the value of such assets and investments during marriage are my and/or Rhona's separate property. While the [PMA] creates certain rights of the community to be apportioned. . . , these provisions do not change the character of the capital that was used to acquire assets and make investments during marriage, which, by definition, were separate property per paragraphs 1 and 2."

Rhona maintained Rick's view of the PMA was not supported by its provisions and that she and Rick "created community property throughout [their] marriage pursuant to both the express language of the PMA and the community property law where the [agreement] is silent," and "[t]o the extent Rick has any current separate property assets, he must trace them to his premarital or post-separation efforts."

Prior to the court hearing, the parties submitted opening trial briefs, followed by responding trial briefs. In her briefs, Rhona largely repeated the assertions she had previously made in support of bifurcating the community property formation question. She asserted there is no "explicit" waiver of community property rights in the PMA as required for such waiver and that the agreement is beset with "numerous conflicting and ambiguous statements." She further claimed that, "[f]or the most part," the PMA "merely restates well-established Family Code principles and presumptions." In his opening and responding trial briefs, Richard disagreed on all points.

By the time of briefing, the parties considered there to be two community property questions before the court: (1) whether community

3

property could be created in any way other than as specified in paragraphs 3 to 7 of the PMA, and (2) whether the parties "contract[ed] out of their respective duties to trace separate property claims" under the Family Code.

None of the briefs provided concrete examples, based on property actually in dispute, to illustrate the import of the parties' respective positions as to the meaning of the PMA. However, some inkling may be gleaned from Rhona's assertion in her opening trial brief that because there was, according to her, no wholesale waiver of community property rights, the "parties were free to create community property" through, for example, (1) "[t]aking title to property in joint name (Family Code[,] § 2581[3]; Probate Code[,] § 5305)," (2) "[i]ncome earned from, and appreciation on, community property," (3) "[f]urther investment of community property," and (4) "[c]ommingling of separate and community property."

Rick responded to each point. As to the first, he claimed that because the parties had assertedly waived their rights under the community property laws, taking title to property jointly did not give rise to any statutory presumption that the property is community property. As to the second and third points, Rick asserted the PMA "contains no language providing that the

---

[3] "Family Code section 2581 is a special presumption at divorce that ' "specifically governs real property designated as joint tenancy." ' [Citations.] Unlike the general community property presumption, the Family Code section 2581 presumption cannot be rebutted by tracing; it can only be rebutted by (1) a clear statement in the deed or other documentary evidence of title that the property is separate property and not community property, or (2) proof that the parties have made a written agreement that the property is separate property." (*In re Brace* (2020) 9 Cal.5th 903, 929.) In other words, " 'the affirmative act of specifying a form of [joint] ownership in the conveyance of title . . . removes such property from the more general [community property] presumption' and places it under the specific community property presumption now stated in Family Code section 2581." (*Ibid.*)

4

rents, issues, profits and proceeds of any community property created through [the provisions of the PMA expressly specifying how community property can be created] and the appreciation in value of such community property occurring during marriage shall be likewise community property." As to the fourth point, Rick acknowledged "there could be comingling of community and separate property funds" but this did not establish a "presumption that such funds are community" because the parties supposedly waived all Family Code provisions, including presumptions. Rather, he maintained the PMA effectively established a presumption that "such funds are separate property unless the community can prove otherwise." (Underscoring omitted.)

At the hearing, the parties presented no evidence other than the PMA and devoted their time to legal argument on the questions before the court. At the close of the hearing, the court ruled from the bench.

As to the first question, the court found no support in the law, "nor clear language in the document itself, that would support" Rick's "separate property presumption" or "[that] the community property created per the PMA would not continue to be defined as such under the Family Code," unless "proven not to be separate property." It found Rick's "argument that the intent of the parties was to use the community property for living expenses only to be nonsensical and in direct conflict with the writing itself." The court concluded "the language of the PMA . . . supports [its] characterization as a confirmation agreement," i.e., that the "parties clearly intend[ed] to preclude the development of community property in their respective separate property owned prior to the commencement of marriage." As to the provisions of the PMA specifying how community property can be created, the PMA does not clearly waive community property rights in "any

5

and all subsequent community property created" through those paragraphs. "Therefore, the community property created pursuant to the PMA remains community property and is subject to California community property law."

As to the second question concerning tracing, the court ruled the PMA not only "specifically provides" for the commingling of separate and community property and tracing in one provision, it is "riddled with the possibility of commingling" in other respects. And as to the latter potentiality, there is no clear waiver of tracing requirements under the Family Code.

The court subsequently filed a written order setting forth its ruling.

## DISCUSSION

### *Interpreting Premarital Agreements*

California law has historically "recognized the power of parties contemplating a marriage to reach an agreement containing terms at variance with community property law. Thus in 1850, the Legislature provided that community property principles shall govern the rights of the parties 'unless there is a marriage contract, containing stipulations contrary thereto.' (Stats. 1850, ch. 103, § 14, p. 255; see also . . . *Barker v. Barker* (1956) 139 Cal.App.2d 206 . . . ['Parties contemplating marriage may validly contract as to their property rights, both as to property then owned by them and as to property, including earnings, which may be acquired by them after marriage [citations], and the codes provide for such agreements. . . .']; see also Fam. Code, § 1500 ['The property rights of husband and wife prescribed by statute may be altered by a premarital agreement or other marital property agreement'].)"[4] (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13 (*Bonds*),

---

[4] All further statutory citations are to the Family Code unless otherwise indicated.

6

partially superseded by statute on other grounds as stated in *In re Marriage of Cadwell-Faso and Faso* (2011) 191 Cal.App.4th 945, 958.)

A "premarital agreement generally has been considered to be enforceable as a contract, although when there is proof of fraud, constructive fraud, duress, or undue influence, the contract is not enforceable. [Citations.] The rules applicable to the interpretation of contracts have been applied generally to premarital agreements." (*Bonds, supra,* 24 Cal.4th at p. 13.) Parties negotiating a PMA are not presumed to be in a confidential relationship that would otherwise give rise to fiduciary duties owed by the spouses or to the presumption of undue influence when a transaction benefits one of them. "On the contrary, it is evident that the Uniform [Premarital Agreement] Act was intended to *enhance* the enforceability of premarital agreements, a goal that would be undermined by presuming the existence of a confidential or fiduciary relationship." (*Id. at* p. 29.)

"In interpreting a written agreement, we 'look first to the language of the contract . . . to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' [Citation.] 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) The intent is to be inferred, if possible, solely from the written provisions of the contract. (Civ. Code, § 1639.) Language in a contract must be interpreted as a whole and in the circumstances of the case, and cannot be deemed ambiguous in the abstract." (*In re Marriage of Facter* (2013) 212 Cal.App.4th 967, 978 (*Facter*), italics omitted, superseded by statute on other grounds as stated in *In re Marriage of Clarke and Akel* (2018) 19 Cal.App.5th 914, 921–922.) " '[I]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the

7

parties, that controls interpretation.' [Citation.] The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)[5]

A contractual waiver of a statutory right " 'must be clearly apparent in the contract and its language must be unambiguous and unequivocal, leaving no room for doubt as to the intention of the parties.[' " (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 804 (*Badie*).) "Although an effective waiver, particularly in a nonadhesive contract, need not expressly state, 'I waive my right to a [statutory entitlement]' or words to that effect, it must clearly and unambiguously show that the party has agreed to" forego such entitlement. (*Ibid.*; accord, *In re Marriage of Carpenter* (2002) 100 Cal.App.4th 424, 428–429 (*Carpenter*) [" 'There must be ". . . an actual intention to relinquish [a statutory right] or conduct so inconsistent with the intent to enforce that right in question as to induce a reasonable belief that it has been relinquished." ' " Quoting *In re Marriage of Perkal* (1988) 203 Cal.App.3d 1198, 1203].) "Where it is doubtful whether a party has waived his or her" statutorily protected rights, "the question should be resolved in favor of preserving that right." (*Badie,* at p. 804.) In *Badie,* for example, the court concluded there was "no unambiguous and unequivocal waiver of the right to a jury trial either in the language of [the bank's] change

---

[5] When it is not possible to infer the parties' intent solely from the written provisions of the agreement, which is often the case in disputes over the meaning of a PMA, the court may admit extrinsic evidence if it supports a meaning to which the language is reasonably susceptible. (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 503.) Despite Rhona's assertion in the trial court that the PMA contains "numerous conflicting and ambiguous statements," neither she nor Rick sought to introduce any extrinsic evidence.

8

of terms provision or in any other part of the original account agreements." (*Id.* at p. 805.) In *Carpenter,* neither the provisions of the PMA nor the extrinsic evidence supported finding a waiver of the right to reimbursement. (*Carpenter,* at pp. 428–429.)

Citing to *In re Marriage of Moore* (1980) 113 Cal.App.3d 22 (*Moore*), Rhona contends that in determining whether a party has waived his or rights to community property, "heightened scrutiny" must be brought to bear and the "standard of proof for waiver is clear and convincing evidence." As subsequent cases, including the *Bonds* case, reflect, *Moore* dealt with a significantly different context, namely a waiver of spousal support in a *post-*marital property settlement. (*Id.* at pp. 25–26.) Post-marriage spouses are fiduciaries with respect to one another, and therefore a greater degree of scrutiny pertains to a waiver of statutory rights. In the context of PMAs, however, the parties are not in a fiduciary relationship, and for that reason, among others, the Supreme Court in *Bonds* rejected a heightened "strict scrutiny" standard to determine whether a party not represented by counsel voluntarily entered into a PMA. (*Bonds, supra,* 24 Cal.4th at p. 12.) The Court of Appeal, in adopting such a standard, had relied on *Moore* and other cases dealing with non-PMA contexts. (*In re Marriage of Bonds* (1999) 71 Cal.App.4th 290, 313, reversed in part by *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 38.) The high court explained that a "strict scrutiny" standard is "inconsistent with Family Code section 1615, which governs the enforceability of premarital agreements." (*Bonds,* at p. 12.) Indeed, such a heightened standard "would have the effect of shifting the burden of proof on the question of voluntariness to the party seeking enforcement of the premarital agreement, even though the statute expressly places the burden upon the party challenging the voluntariness of the agreement. Because the

9

commissioners and our Legislature placed the burden of proof of involuntariness upon the party *challenging* a premarital agreement, it seems obvious that the party seeking enforcement should not be required to prove that the *absence* of any factor tending to establish voluntariness did *not* render the agreement involuntary—the inevitable result were [the high court] to adopt the strict scrutiny standard suggested by the Court of Appeal." (*Id*. at p. 24.)

In short, Rhona has not cited, nor are we aware of, any authority articulating a "heightened scrutiny" or "clear and convincing" standard of *contract interpretation* applicable to PMAs. Rather, the salient inquiry is whether the PMA clearly and unambiguously waives the parties' community or marital property rights.

### The Creation of Community Property

The trial court phrased the first question before it as follows: "Do the terms of the PMA preclude the creation of community property other than as provided in paragraphs 3, 4, 5, 6, and 7 of the PMA or, asked another way, where the PMA specifically provides for the creation of community property, have the parties waived the application of the Family Code to that property or its future derivative?" As we have recited, the court answered, "NO."

The PMA commences with a number of recitals, including the following:

> "B. The parties desire to provide for one another by this Agreement to assure their financial comfort and security, to assure the integrity of their respective properties brought into the marriage by each of them and to provide for the creation of a community estate during their marriage.

> "C. The parties enter into this marriage because of the love and affection each has for the other and neither is interested in acquiring any interest in the property of the other earned prior to their marriage.

10

"D. Each of the parties presently owns property standing in their respective names, the nature and extent of which has been fully disclosed by each to the other.[6]  [¶] . . . [¶]

"I. The parties desire that all property owned by either of them at the time of the marriage and all property coming to them from whatever source during the marriage shall be their respective separate property, except as specifically provided in this Agreement.

"J. The parties desire that all earnings and income resulting from their personal services, skill, effort and work, shall be their respective separate property, except as specifically provided in this Agreement.

"K. The parties intend to acquire a residence in the State of California, in which case Rick intends to furnish the consideration for the purchase of the principal place of residence of the parties and may acquire a secondary residence as well, and intend to take title to such residences in the names of the parties as their community property, but with the intention of retaining the right of reimbursement for his contribution to the acquisition costs and the costs of capital improvements of such residence or residences under the terms of Section 2640 of the California Family Code.  [¶] . . . [¶]

"N. The parties intend that the provisions of this Agreement shall be effective in determining each part's rights in his or her own property and in one another's property, including any rights in the estates of one another at death or their rights in the event of a divorce, the dissolution of their marriage or in the event of a legal separation, whether their property rights are ultimately governed by the laws of the California or any other jurisdiction in which they may reside."

These recitals evidence that the parties had multiple objectives in entering the PMA:  They wanted to ensure that assets and property they owned prior to the marriage, or received by inheritance or gift during the

---

6  Two attached schedules, Schedule A and Schedule B, purport to list this property.  Schedule A lists Richard's assets as over $80 million. Schedule B lists Rhona's assets as over $2 million.

11

marriage, remained their separate property. They wanted to create some community estate during the marriage. They wanted some, but not all, of their "earnings and income resulting from their personal services, skill, effort and work" during the marriage to be their separate property. They intended their primary residence, and any secondary residence, to be community property, with Rick having a right of reimbursement for his contribution to acquisition costs and capital improvements. They intended the provisions of the PMA to be controlling, regardless of the jurisdiction in which they reside at the time of death or when their marriage otherwise ends.

These recitals are followed by 21 enumerated paragraphs.

Paragraphs 1 and 2 are identical except the first pertains to Rick's property, and the second to Rhona's. The pertinent language of these paragraphs is as follows:

> "All property, real and personal, of whatsoever nature and wheresoever situated, owned by [Rick/Rhona] at the commencement of the marriage, or inherited or received by gift during the marriage, all rents, issues, profits and proceeds thereof, and all appreciation in the value of such property occurring during the marriage, whether or not resulting from [his/her] personal services, skill, effort, and work, or from the personal services, skill, effort and work of [Rhona/Rick], subject to the provisions of Paragraph 5, shall be [his/her] separate property and shall be enjoyed by [him/her] and shall be subject to [his/her] disposition as [his/her] separate property . . . . [Rhona/Rick] acknowledges that [she/he] understands that, except for this Agreement, the appreciation with respect to any such property resulting from the personal services, skill, effort and work of Rick or Rhona rendered after the marriage would be community property or quasi-community property under the laws of the State of California, and might be characterized as marital property subject to equitable distribution under the laws of many states of the United States, but that by this Agreement such appreciation is made [his/her] separate property."

Rick maintains these paragraphs provide an "expansive definition" of the parties' separate property. This is an overstatement.

12

Paragraphs 1 and 2 effectuate recitals C, D, I, and J, and confirm that the property each of the parties owned at the time of the marriage, as well as property either of them inherited or received as a gift during the marriage, is their separate property. This is consistent with the definition of "separate" property in the Family Code. (§§ 770, subd. (a), 771.) These paragraphs further provide as to "such" property—that is, property the parties owned at the time of the marriage or received by inheritance or gift during the marriage—that any appreciation resulting from the personal services, skill, effort and work of either shall also be the separate property of the party who owned the property at the time of the marriage or received it by inheritance or gift during the marriage, regardless of any community property or marital law to the contrary. This treatment of appreciation due to the efforts of the parties departs from California's community property law. (See *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 851 (*Dekker*) ["Where community efforts increase the value of a separate property business, it becomes necessary to quantify the contributions of the separate capital and community effort to the increase."].)

Thus, paragraphs 1 and 2 evidence a waiver of *one* aspect of California's community property law—the appreciation of separate property through community effort. These paragraphs by no means constitute wholesale waivers of all community or marital property rights.

The third paragraph of the PMA states:

"Except as provided in Paragraphs 1 and 2 and the following Paragraphs 5, 6 and 7, all earnings of the parties from their personal services, skill, effort, and work shall be the community property of the parties."

This paragraph effectuates recitals B and J. It is also consistent with the language of the paragraphs 1 and 2 specifying that any appreciation in

13

property the parties owned at the time of the marriage or received by inheritance or gift during the marriage, resulting from the personal services, skill, effort and work of either, shall be the separate property of the party who owned the property at the time of the marriage or received it by inheritance or gift during the marriage, regardless of any community property or marital law to the contrary. We discuss paragraphs 5, 6 and 7, *infra.*

Notably, the third paragraph does not contain language characterizing as either community or separate property any income generated by community earnings or any appreciation in the value of assets purchased with community earnings. More to the point, it does not contain any language along the lines of that in paragraphs 1 and 2 expressly waiving community property and marital rights in the appreciation of separate property through community effort. That is, paragraph 3 does not recite that the income generated by community earnings or any appreciation in the value of assets purchased with community earnings is generally considered community or marital property, but the parties are agreeing to treat it differently. (*Dekker, supra,* 17 Cal.App.4th at p. 851 ["It is well settled in California that income produced by an asset takes on the character of the asset from which it flows. Thus, rents, issues and profits are community property if derived from community assets, and separate property if derived from separate assets."].)

This appears to be what the trial court focused on in concluding that community property can be created in ways other than as specified in paragraphs 3 through 7 of the PMA. The court's order states, for example:

> "To infer that a 'community property waiver' applies to any and all subsequent community property created in paragraphs 3 through 7 is not supported by the document itself, which states at B, again, that the

14

parties' desire to provide for the creation of a community estate during their marriage."

"[T]he PMA very clearly set forth the desire and mechanism by which to create a community estate during the marriage. Nowhere in the document is there any language that would prevent that property as being considered in any way other than pursuant to California community property law. Therefore, the community property created pursuant to the PMA remains community property and is subject to California community property law."

Rick asserts the court's order reflects a "complete misunderstanding" of his position with respect to the PMA and the trial court "confused" the "concept of 'community *creation*'" with "how the community created pursuant to Paragraphs 3 through 7 was *used* during" the marriage. (Italics added.) He claims he "never contended" that community income, for example, "could not be used for the purposes of purchasing other assets, investment, reinvestment or commingled with separate property," nor did he ever "argue[] that the community character of [community property created in accordance with paragraphs 3 through 7] would be forfeited or transmuted to separate property if such property was reinvested or used to purchase other assets." The trial court did not misunderstand Rick's position.

As we have recited, Rhona asserted in her trial brief that paragraphs 3 through 7 do not foreclose the creation of community property by other means, for example through "[i]ncome earned from, and appreciation on, community property" and "[f]urther investment of community property." Rick's response to this point in his responding trial brief is telling.

He first asserted that "[d]espite [the] clear and unambiguous language of Paragraph [recital] I, Rhona persists in insisting that community property may be created outside the confines of Paragraphs 3, 4, 5, 6 and 7. She specifically claims that community property can be created by: (1) 'taking

15

title to property in joint name (Family Code[,] § 2581; Probate Code[,] § 5305)[']'; (2) 'income earned from, and appreciation on, community property and further investment of community property'; and (3) 'commingling of separate and community property.'" He then addressed each point.

As to income earned from, and appreciation of, community property, he argued "Paragraph [recital] I of the PMA provides that all property coming to the parties from whatever source during their marriage 'shall be their respective separate property, except as specifically provided for and created in Paragraphs 3, 4, 5, 6 and 7.' . . . However, as Rhona acknowledges, the PMA contains no language providing that the rents, issues, profits and proceeds of any community property created through Paragraphs 3, 4, 5, 6 and 7 and the appreciation in value of such community property occurring during marriage shall be likewise community property." He went on to assert "[t]he omission discussed above was intentional. . . . Notably, Paragraphs 1 and 2 purposefully includes [*sic*] such income and appreciation in the definition of separate property." He then maintained that "[e]ven if inclined to favor community property, the Court is not empowered to add the missing terms to Paragraphs 3, 4, 5, 6 and 7. While the Court has jurisdiction to enforce the PMA, it cannot add terms or provisions to the contract. . . . As the parties deliberately omitted to include the rents, issues, profits and proceeds and any appreciation in the value of any community property occurring during the marriage, the Court cannot add these omitted terms in enforcing the contract and thus no community may be created by this means."

Thus, Rick did *not* argue that Rhona's "income earned from, and appreciation on, community property" example confused the "creation of" community property and the "use of" community property. Rather, he argued

16

that the PMA expressly declares any income generated by community earnings or any appreciation in the value of assets purchased with community earnings is *not* community property and, instead, is separate property, and the parties thus waived their community property interests therein. To say that Rick appears to be back-pedaling on appeal is putting it charitably.

Nor did the trial court err in rejecting Rick's argument that recital I, in conjunction with paragraphs 1 and 2, constitute a wholesale waiver of all community and marital property rights, including community property rights in any income earned from, and appreciation of any property purchased with, community earnings.

When the PMA is considered as a whole, as it must be, it is apparent that recital I is merely that—a recital, and one of many, stating the parties' *multiple* purposes in entering into the PMA. While recital I states "[t]he parties desire that all property owned by either of them at the time of the marriage and all property coming to them from whatever source during the marriage shall be their respective separate property," it goes on to state "except as specifically provided in this Agreement." Paragraph 3 is such an exception. In his appellate briefing, Rick also points to recital J, which states "[t]he parties desire that all earnings and income resulting from their personal services, skill, effort and work, shall be their respective separate property, except as specifically provided in this Agreement." Again, recital J is one of many recitals setting forth the parties' multiple purposes in entering into the PMA, and paragraph 3 is one of the exceptions heralded by this recital.

Paragraphs 1 and 2, as we have discussed, confirm that all property the parties owned at the outset of the marriage and all property they receive by

17

inheritance or gift during the marriage, is their separate property. These paragraphs further specify that any appreciation of this property during the marriage, including appreciation due to the efforts of either party, is also the separate property of the party who owned the property at the outset of the marriage or received it by inheritance or gift during the marriage. These two paragraphs have nothing to do with paragraph 3 and the creation of community earnings, let alone, any income generated by such community earnings or appreciation of property procured with such earnings.

In short, paragraph 3 is silent as to the character of income generated by community earnings and appreciation of property procured with such earnings. Nor do recitals I or J, or paragraphs 1 and 2 speak to this issue, let alone, make unequivocally clear that the parties have chosen to forego any community or marital property interests in such income or property. (See *Carpenter, supra,* 100 Cal.App.4th at p. 428 [where PMA was "silent" as to reimbursement, "it [could not] have the effect of a waiver" of the parties statutory right of reimbursement].)

Accordingly, for this reason alone, the trial court did not err in answering the broad question put to it—"[D]o the terms of the [PMA] preclude the creation of community property pursuant to Family Code [s]ection 760 et seq., except as specifically provided in paragraphs 3, 4, 5, 6, and 7 of the [PMA]?"—in the negative. (Italics omitted.)

Although Rick has not emphasized any particular language in paragraphs 4 through 7 in making his case on appeal, these paragraphs warrant some mention since they are entirely consistent with the trial court's view, and our view, that in executing the PMA the parties waived some, but not all, of their community and marital property rights.

18

Paragraph 4 effectuates recital K. It reiterates that the parties intend to acquire a primary residence and may acquire a secondary residence, that Rick will fund the purchases, and that the parties will take title in both their names as community property. It also confirms that Rick retains the right of reimbursement under section 2640 for acquisition costs and costs of any capital improvements. It further states that if the parties acquire any additional residences, "either party or both shall furnish the consideration" and title will be taken "in such a manner as they then determine and with or without retaining the right of reimbursement as they shall then determine." Plainly, this language does not waive any, let alone all, community or marital property rights. Rather, it leaves open the possibility the parties might purchase additional residences with Rick's and/or Rhona's separate property (or with community earnings), leaves open the manner in which they take title to further agreement (and says nothing about the import of taking title as joint tenants), and leaves open the question of reimbursement.

Paragraph 5, like Paragraph 3, effectuates recitals B and J. It states in pertinent part that "[e]xcept as provided under paragraph 7 hereof, commencing with the year commencing on January 1, 2000, and continuing annually thereafter until the termination of the marriage, each of the parties shall transfer to the community property of the parties, a sum equal to twenty-five percent (25%) of his or her Total After-Tax Income from his or her separate property[7] . . . with the intent of transmuting such sum into the community property of the parties from their respective separate property. With each year of marriage, the percentage of the Total After-Tax Income of

---

[7] "Total After-Tax Income" is defined, and the manner in which it is calculated is set forth, in sub-paragraphs (a) through (i). The particulars of this complex formula are not material to the issues now before the court.

19

their respective separate property assets shall increase to two and one-half percent (2.5%) increments until fifty percent (50%) of such Total After-Tax Income shall be transmuted to community property in the tenth (10th) year of marriage and every year thereafter."[8]   Paragraph 5, like Paragraph 3, is silent as to the character of any income generated by the community funds created by transmutation or the appreciation of property procured with such funds.  In short, no language waives any, let alone all, community or marital property rights.[9]

Paragraph 6 elaborates on what "Total After-Tax Income" means in the year of a dissolution.  For that year, such income also includes "the unrealized appreciation and unrecognized gain of the separate property of the parties, dating from the date of the marriage to the date of the filing of the petition for divorce . . . , determined as if all of Rick's and Rhona's separate property were sold and all such gain recognized at the termination of the marriage."  No language in this paragraph constitutes a wholesale waiver of community or marital property rights.

---

[8]  Paragraph 8 provides that under certain specified circumstances, and to a certain specified extent, Rick's transfers of his separate property will be reimbursed.

[9]  Paragraph 10 states that until "the community property of the parties exceeds Three Million Dollars ($3,000,000), Rick shall deposit such sums as are reasonably necessary for the parties' living expenses into a joint bank account from which they shall pay their living expense with no rights of reimbursement."  "Once the community property . . .exceeds Three Million dollars . . ., all normal living expenses . . . shall be paid from the community property earnings and the annual addition to community property under the paragraph 5 adjustment."  "[L]uxuries of life" may be paid for with "community property only with the agreement of the parties."  The paragraph additionally states "expenses relating to the upkeep and maintenance of property owned as separate property shall be paid from the separate property of the owner."

Paragraph 7 effectuates recitals B, C, I, and J. It states, "[i]f either party commences or participates in a new business or start-up company directly or through any corporation, partnership, or other entity, the initial capital of such business or start-up company shall be contributed in equal shares by the parties from their respective separate property, and the business or start-up company shall be owned by the parties in equal shares as their community property." It goes on to state, "[i]f either party declines to invest in such business or start-up company and if the other participates in the operation of the new business or start-up as an employee, officer, director or founder, the party's investment or contribution from his or her separate property shall retain its character as separate property with any appreciation in such investment or contribution being subject to the provisions of paragraph 5 hereof, but all return on any founder's stock, stock options, or restricted stock which are subject to a vesting schedule or buy-back option on the part of the company based upon the continued services of Rick or Rhona to the company in whatever capacity or on any stock received as a director, consultant, advisor or other such position, without consideration other than the services rendered by Rick or Rhona in that capacity, shall be the community property of the parties. This paragraph places certain parameters on the characterization of certain business interests the parties may acquire during the marriage. But it does not constitute a waiver of all community or marital property rights.

Rick maintains paragraphs 14 and 16 also "unmistakably voiced [the parties'] intention and agreement to opt out and waive any" community property rights. Paragraph 14 states, "Each of the parties recognizes that the laws of California affecting the marital rights and interests of persons in *the estates of their spouses* may from time to time be changed, limited, or

enlarged and that the laws of other states or countries may extend greater or lesser rights and interests to persons in the estates of their spouses. It is the intention and agreement of the parties to waive and release all such existing rights and interests and as they may be amended or enlarged in the future under the laws of California or as they may exist, be amended or enlarged in any other jurisdiction which may at the time be applicable." (Italics added.) Reading the PMA as a whole, this paragraph plainly works in conjunction with paragraphs 1 and 2, whereby the parties waived any rights in each other's separate property (that is, property they owned at the time of the marriage or received by inheritance or gift during the marriage), *except* as provided in paragraphs 3 through 7. Specifically, paragraph 14 makes clear that this waiver is not only a waiver of whatever statutory rights existed at the time the parties executed the PMA, but also of any rights created by subsequent law.

Paragraph 16 states in pertinent part, "Each party has had the opportunity to be represented . . . by counsel of his or her own choosing. . . . Each of the parties has read this Agreement and is fully aware of the contents thereof and of its legal effect. The parties acknowledge that they fully understand that by this Agreement each is giving up substantial community property rights which each would otherwise acquire during their marriage and that in spite of that effect, each freely and voluntarily enters into this Agreement." This is essentially a boilerplate provision designed to foreclose any claim either of the parties was coerced or mislead into entering into the PMA, or that the PMA is unconscionable and unenforceable. Plainly, this language does not constitute a wholesale waiver of community or marital property rights.

In his appellant's closing brief, Rick suggests *In re Marriage of Dawley* (1976) 17 Cal.3d 342 (*Dawley*) and *Facter, supra,* 212 Cal.App.4th 967 support his claim that the PMA waived *all* community and marital property rights. However, neither advances his case.

The principal issue in *Dawley* was whether a PMA entered into by parties who anticipated a marriage of limited duration was void as contrary to public policy. The court held it was not. (*Dawley*, *supra*, 17 Cal.3d at p. 346.) The court also ruled a boat purchased and maintained solely with the husband's separate property was his separate property even though the loan to purchase the craft had been extended in the names of both parties. (*Id.* at pp. 357–358.) The parties presented evidence beyond the PMA (including that the parties agreed to a "temporary marriage" to spare the wife a nonmarital pregnancy she feared would lead to her dismissal as a teacher), and the trial court made specific findings of fact as to the parties' intent. (*Id.* at pp. 347–348, fn. 1.) Here, the record is decidedly different. And while some provisions of the PMA at issue in *Dawley* are similar to those in the PMA at issue here, in many respects the provisions of the PMA here differ, for example, by including provisions providing for the creation of community property.

The principal issue in *Facter* was whether the trial court erred in invalidating a PMA in its entirety because it included a waiver of spousal support. (*Facter, supra*, 212 Cal.App.4th at p. 978.) The court agreed there was a waiver of support in light of a paragraph stating, "The provisions of paragraph 2, *supra,* [stating wife was to receive a certain amount of cash and half the profits on the sale of the marital residence] constitutes [wife's] sole right to property acquired during the marriage *and to support,* and replace or superseded any entitlement to such property that [wife] might otherwise

23

have under law." (*Id.* at p. 979, 983.)  It also agreed spousal support could legally be waived, but held the waiver at issue was unconscionable and therefore unenforceable.  (*Id.* at pp. 980–984.)  The court additionally agreed the spousal waiver could be severed, leaving the remainder of the PMA in force.  (*Id.* at pp. 985–991.)  In discussing severance, the court stated in passing that one of the paragraphs "effectively constitut[ed] a waiver of community property rights."  (*Id.* at p. 989.)  That paragraph, set forth in a four-page document under a heading entitled " 'Property Rights,' " stated: " 'In consideration of their sharing a home, and of their marriage, and of the promises contained in this agreement [the parties] agree as follows: [¶] . . . [¶]  1.None of the property acquired during their marriage shall be community property.' "  (*Id.*  at p. 971, fn. 2.)  The 16-page PMA here is not remotely comparable.

In sum, the PMA at issue here alters *some* of the community or marital property principles that would otherwise apply absent the PMA.  But no language can be characterized as an unequivocal, wholesale waiver of community or marital property rights, particularly with respect to matters on which the PMA is silent.

### *Tracing*

The trial court phrased the second question before it as whether "[b]y entering into the PMA, did the parties contract out of their respective duties to trace separate property claims under the California community property law?  Its answer, again, was "NO."

The court explained its answer as follows:

"The PMA provides not only for the creation of community property and separate property, it specifically provides for its commingling.  Although paragraph 4 specifically calls out the obligation to trace by referencing Family Code [s]ection 2640, the PMA is riddled with the possibility of commingling the parties' separate and community

24

property. The fact that Family Code [s]ection 2640 was not referenced in each place that the PMA could result in commingling did not amount to the parties waiving or contracting out of that obligation. . . . [N]or does the language of the PMA support the argument that the parties waived all provisions of the Family Code regarding the obligation of tracing."

"Tracing" is used to determine the character of property acquired during a marriage and, more specifically, whether the property was acquired with or generated by separate or community property, or both. (See generally *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 90–91 (*Ciprari*).) Parties have a great deal of latitude in the methodology used to trace the source of assets. Traditionally, parties have often used "direct tracing"[10] or "exhaustion tracing."[11] However, as the court discussed in *Ciprari,* parties are not limited to these two methods. To the contrary, "trial courts have the flexibility to consider any credible evidence and to evaluate alternative tracing methods to determine whether the proponent of the tracing carries his or her burden of proof. The tracing method may vary depending on the

---

[10] " 'Direct tracing' can be used to demonstrate a spouse's separate property was used to purchase an asset, even though the purchase is made with funds from a commingled account containing both separate and community property. It requires (a) documentary proof that sufficient separate property funds were available in the account at the time of purchase and (b) proof that the spouse making the purchase intended to use separate, rather than community, funds." (*Ciprari, supra,* 32 Cal.App.5th at pp. 95–96.)

[11] Exhaustion tracing "attempts to trace a payment or purchase from a commingled mass to separate property funds by process of elimination; i.e., by showing that—because *all* community property funds were exhausted at the time the purchase or payment at issue was made—separate property funds necessarily must have been used. [Citation.] This approach presumes that available community property funds are used for family expenses before separate property funds are used for that purpose." (*Ciprari, supra,* 32 Cal.App.5th at p. 96.)

25

facts. Thus, trial courts are free to consider and credit reasonable, well-supported, and nonspeculative expert testimony, when determining whether the proponent has successfully traced commingled assets to a separate property source."[12] (*Ciprari*, at p. 97.)

Since we agree with the trial court that the parties could create community property by means other than as set forth in paragraphs 3 through 7 of the PMA—for example, by investment of, or the purchase of property with, community earnings created pursuant to paragraph 3—it is certainly possible, as the trial court recognized, that the parties may dispute whether a particular investment or property was procured with community and/or with separate property. The only feasible way the trial court can resolve such a dispute is with tracing evidence.

Rick acknowledges he must present tracing evidence in connection with reimbursement for the purchase of the parties' primary and secondary residences, and capital improvements thereof, since paragraph 5 makes express reference to section 2640.[13] He asserts, however, that neither he nor Rhona has any other obligation to conduct what he calls "Family Law Tracing" because "the parties explicitly waived all their existing rights and interests under California community property law," and "[i]ncluded in such waiver is a waiver of the community property presumption under Family

---

[12] Accordingly, Rick's complaint that there are significant constraints on the kinds of evidence that can be presented to support tracing, making tracing unduly burdensome, is unfounded.

[13] Section 2640 states in pertinent part, "unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source." (§ 2640, subd. (b).)

Code section 760." He maintains "there is not a single term in the PMA which specifically provides that the . . . section 760 community property presumption or any community property presumption applies to commingled accounts and/or assets acquired during the marriage."

To begin with, Rick has it backwards. PMAs are not required to expressly confirm statutory community or marital property rights, including the presumptions that pertain thereto. To the contrary, PMAs are a means to contract out of these rights as to some or all of the parties' property, and to do so, they must clearly and unequivocally express such intent. *If* they do so, the waiver encompasses, of course, statutory presumptions pertinent to such property. (See *Dawley, supra,* 17 Cal.3d at p. 357 ["the presumptions of the Family Law Act do not govern the status of marital property when 'there is a marriage settlement containing stipulations contrary thereto' "].)

Here, however, the parties did not, contrary to Rick's claim, "contract[] out of the entire system of California community property" and thereby embrace a "default rule that all property" is the separate property of one or the other of the two parties. As we have discussed, the parties waived their community and marital property rights only as to *some* assets, leaving open the possibility, indeed the likelihood, that characterization issues would arise on divorce or death. Nowhere in the PMA is there any provision that clearly and unequivocally waives their respective obligations to present legally sufficient evidence to enable the court to rule on the character of any asset or property as to which there is a dispute.

## DISPOSITION

The order after hearing dated February 22, 2022, regarding the interpretation of the PMA, is AFFIRMED. Respondent to recover costs on appeal.

27

_____

Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Bowen, J.*

**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A164992, Thompson v. Thompson